BLOOMFIELD CHARTER TOWNSHIP v OAKLAND COUNTY CLERK

Docket No. 238209. Submitted July 10, 2002, at Detroit. Decided September 6, 2002, at 9:00 A.M. Leave to appeal sought.

Bloomfield Charter Township brought an action in the Oakland Circuit Court against the Oakland County Clerk and the Oakland County Director of Elections, challenging the petitions initiating and the scheduling of an election to decide whether certain property located in the township could be annexed to the city of Pontiac. The city of Pontiac was allowed to intervene as a defendant as were the owners of the property comprising the annexation area, Harbor Telegraph 2103, L.L.C., and others. The parties stipulated that the Oakland County Director of Elections be dismissed from the action. The court, Denise Langford Morris, J., granted summary disposition in favor of the defendants, finding that an injunction was not appropriate because a postelection quo warranto action would provide the township an adequate remedy at law, that the petitions did not contain material defects, that vacant land could be included in the area to be annexed, that no equal protection violation occurred, and that there was no merit to the township's common-law claim of gerrymandering. The township appealed.

The Court of Appeals *held*:

1. The court properly found that pursuant to subsection 34(5) of the Charter Township Act, MCL 42.34(5), an annexation area containing registered electors may also encompass undeveloped lands and other portions of land otherwise not containing registered electors.

2. The court correctly declined to enjoin the election on the basis that a postelection quo warranto action under MCL 600.4545 constituted an adequate legal remedy available to the township.

3. The petitions undisputedly contained several variations from the language prescribed by statute. However, the court properly applied the substantial compliance doctrine to find that the petitions substantially complied with §§ 482 and 544c of the Michigan Election Law, MCL 168.482, 168.544c. The court properly refused to permit the minor defects in the petitions to preclude the annexation election.

4. The court properly found that the petitions contained the signatures of the required twenty percent of the registered electors living within the annexation area. The signatures, pursuant to MCL 42.34(5), had to be those of "registered electors." The language of subsection 34(5), the more specific statute under which the petitions were circulated, controls in this matter over the general and standardized language prescribed in subsection 482(4) of the Michigan Election Law, which uses the terms "qualified and registered electors."

5. The challenged petitioners properly signed the petitions pursuant to MCL 42.34(5) because they met the requirements for registering as an elector provided in MCL 168.492.

6. A rational basis supports the Legislature's decision to permit through MCL 42.34(5) the annexation of charter township property by separate majority votes of the qualified and registered electors living within the annexation area and eligible voters residing in the annexing city or village. The court properly granted summary disposition of the township's equal protection claim.

7. The court did not abuse its discretion in granting a protective order preventing the township from deposing the signers of the petitions.

Affirmed.

1. TOWNSHIPS — CHARTER TOWNSHIP ACT — ANNEXATIONS.

Subsection 34(5) of the Charter Township Act, which allows the annexation of a portion of a charter township contiguous to a city or village to the city or village where the annexation area contains registered electors, does not prevent the annexation of an area that contains registered electors and also encompasses undeveloped land and other portions of land otherwise not containing registered electors (MCL 42.34[5]).

2. ELECTIONS — PETITIONS — DEFECTIVE PETITIONS.

Doubts regarding technical deficiencies in petitions concerning any proposal subject to election or the failure of the petitions to comply with the exact letter of the procedural requirements pertaining thereto generally are properly resolved in favor of permitting the people to vote and express their will; the doctrine of substantial compliance may be employed in determining whether defects in a petition should preclude an election called for by the petition.

3. TOWNSHIPS — CHARTER TOWNSHIP ACT — ANNEXATION PETITIONS — WORDS AND PHRASES — REGISTERED ELECTORS.

The Charter Township Act provides that a petition seeking the annexation of township land contiguous to a city or village to that city or

village must be signed by twenty percent of the "registered electors" in the area to be annexed; the Michigan Election Law provides that every person who has the statutory qualifications of an elector, or who will have those qualifications at the next election or primary election, shall be entitled to be registered as an elector; the provision of the Michigan Election Law prescribing general and standardized petition language and providing for the signing of petitions by "qualified and registered electors" does not control where the more specific Charter Township Act provides for petitions to be signed by "registered electors" (MCL 42.34[5], 168.482[4], 168.492).

4. CONSTITUTIONAL LAW — CHARTER TOWNSHIP ACT.

The annexation referendum provisions within subsection 34(5) of the Charter Township Act further a legitimate governmental interest and rationally relate to achieving that interest in such a manner that they do not violate constitutional equal protection guarantees (MCL 42.34[5]).

*Secrest, Wardle, Lynch, Hampton, Truex and Morley* (by *William P. Hampton, Gerald A. Fisher,* and *Janet Callahan Barnes*) for Bloomfield Charter Township.

Oakland County Corporation Counsel (by *Julie L. Secontine, William G. Pierson,* and *Keith J. Lerminiaux*) for the Oakland County Clerk.

*Keith Norman* and *McGinty, Jakubiak & Hitch, P.C.* (by *Dennis E. McGinty*), for the city of Pontiac.

*Honigman Miller Schwartz and Cohn LLP* (by *Barry L. Howard, Norman Hyman, Susan K. Friedlaender, Timothy Knowlton,* and *John D. Pirich*) for Harbor Telegraph 2103, L.L.C., Bloomfield Acres Acquisition Company, L.L.C., Harbor Telegraph 1881, L.L.C., Harbor Telegraph 1899, L.L.C., and Harbor Vogue Plaza, L.L.C.

Before: GAGE, P.J., and CAVANAGH and WILDER, JJ.

GAGE, P.J. This appeal involves plaintiff Bloomfield Charter Township's challenge to the petitions initiating and the scheduling of a September 11, 2001, election to decide whether intervening defendant city of Pontiac could annex property located in Bloomfield Township. The circuit court refused the township's request to enjoin the annexation election and ultimately granted defendants summary disposition with respect to the several counts of the township's complaint. We affirm.

I

The remaining intervening defendants, Harbor Telegraph 2103, L.L.C., Bloomfield Acres Acquisition Company, L.L.C., Harbor Telegraph 1881, L.L.C., Harbor Telegraph 1899, L.L.C., and Harbor Vogue Plaza, L.L.C. (the Harbor Companies), owned the approximately seventy-five-acre parcel of property in Bloomfield Township comprising the annexation area. The Harbor Companies unsuccessfully sought the township's permission to create a mixed use development on the property. After the township refused, the Harbor Companies sought to have their property annexed to the adjoining city of Pontiac, the government of which had expressed support for the development proposed by the Harbor Companies.

The Harbor Companies set about seeking to obtain petition signatures from twenty percent of the registered electors in the area of the township for which annexation was sought. This number of signatures triggers an annexation election pursuant to MCL 42.34(5) of the Charter Township Act, MCL 42.1 *et seq.* Under subsection 34(5), a successful annexation occurs on "approval by a majority of the quali-

fied and registered electors voting on the question in the city . . . to which the portion is to be annexed, and the portion of the township which is to be annexed, with the vote in each unit . . . counted separately."

Two employees of the Harbor Companies took petitions to residents of the annexation area to ascertain whether the residents would sign them. Most of the township residents who signed as petitioners also signed their petitions indicating that they had circulated them.[1] Consequently, most of the petitions bear only one resident's signature as both petitioner and circulator. In at least one instance, a Harbor Company employee gave a resident a petition form, which the resident then signed in the presence of a neighbor, who then signed the petition as its circulator. On July 10, 2001, signatures of twelve petitioners were filed with the office of defendant Oakland County Clerk.

Defendant Oakland County Director of Elections Mary Jo Hammond testified during her deposition that she matched the names of the petition signers with names appearing on the Qualified Voter File (QVF) maintained by the Secretary of State. On July 12, 2001, the QVF reflected that forty registered voters resided in the annexation area. Hammond determined that the petitions contained the signatures of more than twenty percent of the registered voters residing in the annexation area.[2]

Also on July 12, the township clerk filed with the county clerk a sworn complaint requesting an investi-

---

[1] It appears that all, or nearly all, of the petitioners resided in housing that the Harbor Companies owned within the annexation area.

[2] Hammond testified during her deposition that she matched ten petition signatures with names appearing in the QVF.

gation into the legality of the signatures on the petitions. Hammond testified that the county clerk, who does not maintain voter records containing voter signatures, generally does not compare petition signatures against the signatures contained within township or city voting records. In light of the simple task presented in verifying the few signatures on the petitions involved in this case, however, Hammond telephoned the township clerk's office and requested that they fax her the township "master cards" that contained voter signatures. According to Hammond, the township never responded to her request. The county clerk certified the petitions on July 12 and scheduled a referendum election regarding annexation for September 11, 2001.

On July 13, 2001, the township initiated the instant action against Hammond and the county clerk, after which Pontiac and the Harbor Companies successfully intervened as necessary parties defendant.[3] The township's amended complaint set forth the following counts: count I alleged the petitions for annexation were invalid on the bases that (1) the proposed annexation area improperly contained a vacant area of land distinct from the area where the petitioners resided, (2) the petitions did not contain sufficient signatures by "lawful registered electors," (3) the Harbor Companies engaged in "an improper attempt to undermine the election laws of [Michigan] and [township] zoning ordinances" because (a) the proposed development would adversely affect "the health, safety and general welfare of the [township's]

---

[3] Pursuant to the parties' stipulation, the circuit court ordered Hammond's dismissal from the action on August 8, 2001.

residents," and (b) the companies "manipulated" "the number and identity of the registered electors" in the annexation area by encouraging petition signers to register as voters on the same day that they signed petitions, (4) the scheduled election date was not a primary election date, as required by statute, and (5) the irregular boundaries of the annexation area reflected illegal "[g]errymandering"; count II alleged officials in the county clerk's office breached their statutory duty to investigate the township's concerns regarding the validity of petition signatures; count III alleged the annexation election process violated the equal protection rights of township residents outside the annexation area, who would not have a vote in the election; count IV sought a temporary restraining order and injunction to prevent the occurrence of an election, a declaration of the petitions' illegality, and the entry of an order setting aside the county clerk's order that the September 11, 2001, election take place; count V alleged the petitions were defective because they failed to comport with numerous, mandatory statutory petition requirements; count VI alleged insufficient valid petition signatures existed to trigger an annexation election because (a) two individuals who signed a petition never resided in the annexation area, (b) the petition signatures of two unnamed individuals did not match their signatures on voter registration forms, and (c) at least six individuals who signed petitions were not "qualified electors" because they had not resided in the township for thirty days before signing petitions; and count VII alleged the Harbor Companies committed "a fraud on [township] citizens and taxpayers" by "rush[ing]"

tenants into the annexation area and inducing them to sign petitions.

Pursuant to the township's request, the circuit court scheduled a hearing and ordered that defendants show cause why it should not grant the relief requested by the township, specifically, an order setting aside the county clerk's certification of the petitions and an injunction to prevent the scheduled election. After a July 18, 2001, hearing, the circuit court declined to order injunctive relief because it was "not persuaded that the [township] has carried the burden in regard to injunctive relief." The court explained that at that early stage of the case it did not believe that defendants acted improperly in certifying the petitions and ordering the election or that it should order an investigation into alleged election law irregularities.

Several motions for summary disposition, and much briefing, by the parties led to the circuit court's ultimate resolution of the issues as follows:

(1) The circuit court declined to grant the township equitable relief in the form of an injunction preventing the upcoming annexation election on the basis that a postelection quo warranto action pursuant to MCL 600.4545 constituted "an adequate remedy at law."

(2) The circuit court rejected the township's claims that the petitions contained material defects. The court concluded that the county clerk properly certified the petitions because they "contained [signatures of] at least 20% of the registered electors in the area to be annexed, were circulated in the area to be annexed, bear the names of the circulators and con-

tain sufficiently clear information so that those signing them could understand what they were signing."

(3) The circuit court determined that MCL 42.34(5) clearly and unambiguously contemplated that vacant land could be incorporated in the "area to be annexed."

(4) The circuit court rejected the township's allegation of an equal protection violation, finding that a rational basis existed for permitting only the township residents within the annexation area, and not the vast majority of the remaining township population, to vote in the annexation election.

(5) The circuit court found "no basis in the annexation statute for [the township's] common-law claim of 'gerrymandering,' " and concluded that the annexation area otherwise satisfied the applicable statutory contiguity requirement.

The court denied the township's motions for summary disposition and granted defendants' motions for summary disposition of the township's complaint pursuant to MCR 2.116(C)(8) and (10).

The election took place as scheduled on September 11, 2001. Pontiac voters approved the annexation by a margin of 5,879 to 1,086, and the township voters living within the annexation area cast fourteen votes in favor of annexation and eight votes against it.

II

The township first contends that the circuit court erred in determining that areas of vacant township land were subject to annexation pursuant to MCL 42.34(5). We review de novo this legal question of statutory construction. *Saginaw Co v John Sexton*

*Corp of Michigan*, 232 Mich App 202, 214; 591 NW2d 52 (1999).[4]

Well-established principles guide this Court's statutory construction efforts. We begin our analysis by consulting the specific statutory language at issue. *In re MCI Telecommunications Complaint*, 460 Mich 396, 411; 596 NW2d 164 (1999).

> When faced with questions of statutory interpretation, our obligation is to discern and give effect to the Legislature's intent as expressed in the words of the statute. We give the words of a statute their plain and ordinary meaning, looking outside the statute to ascertain the Legislature's intent only if the statutory language is ambiguous. Where the language is unambiguous, "we presume that the Legislature intended the meaning clearly expressed—no further judicial construction is required or permitted, and the statute must be enforced as written." [*Pohutski v City of Allen Park*, 465 Mich 675, 683; 641 NW2d 219 (2002) (citations omitted).]

When an ambiguity exists in a statute so that reasonable minds could differ regarding the meaning of the statutory language, the interpreting court should accord every statutory word or phrase its plain and ordinary meaning. *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 736; 641 NW2d 567 (2002).

---

[4] We also review de novo the circuit court's summary disposition ruling. A motion pursuant to MCR 2.116(C)(8) tests a claim's legal sufficiency on the basis of the pleadings alone to determine whether the plaintiff has stated a claim on which relief may be granted. A motion under MCR 2.116(C)(10) tests the factual support of a plaintiff's claim. In reviewing a motion under MCR 2.116(C)(10), the court considers the pleadings, affidavits, depositions, and other documentary evidence submitted by the parties to determine whether any genuine issue of fact exists to warrant a trial. *Spiek v Dep't of Transportation*, 456 Mich 331, 337; 572 NW2d 201 (1998).

Section 34 of the Charter Township Act, MCL 42.34, addresses a city or village's annexation of charter township property. Subsection 34(1) provides that charter townships meeting certain standards, all of which undisputedly apply with respect to Bloomfield Township, are exempt from annexation except as provided within subsections 34(2) through (8). The county clerk cited subsections 34(5) and (6) in certifying the petitions and ordering the September 11 annexation election. Subsections 34(5) and (6) provide as follows:

> (5) Notwithstanding subsections (1) and (3), a portion of a charter township contiguous to a city or village may be annexed to that city or village upon the filing of a petition with the county clerk which petition is signed by 20% of the registered electors in the area to be annexed and approval by a majority of the qualified and registered electors voting on the question in the city or village to which the portion is to be annexed, and the portion of the township which is to be annexed, with the vote in each unit counted separately.
>
> (6) If a petition is filed pursuant to subsection (5), the county clerk, after determining the validity of the petition, shall order a referendum on the question of annexation. This referendum shall occur within 1 year after the validation of the petitions. The referendum shall be held at the first primary or general election held in that county not less than 60 days after the validation of the petition . . . .

According to the township, annexation of the township area, which included a large portion of vacant property with no registered voters, could have proceeded properly only pursuant to subsections 34(4) or (8), which provide as follows:

> (4) Notwithstanding subsection (1), if a qualified elector does not reside in the territory proposed to be annexed which is contiguous to the city or village, other than the 1

or more persons petitioning, or if a petition signed by 1 or more persons, firms, corporations, the United States government, or the state or any of its subdivisions which collectively hold the equitable title as vendee under a recorded land contract or memorandum of land contract, or recorded legal title to more than ½ of the area of the land in the territory to be annexed is filed with the city or village and with the township board of the charter township in which the territory is situated, the annexation may be accomplished by the affirmative majority vote of the city council or village board of the city or village and the approval of the charter township board of the township.

\*      \*      \*

(8) The common boundary of a charter township and a city or village may be adjusted by resolution approved by a majority of each of the respective governing bodies after the governing bodies give 90 days' notice to property owners in the area proposed for the boundary adjustment, and the governing bodies conduct a public hearing on the proposed boundary adjustment.

The township theorizes that these statutory subsections reflect the Legislature's endorsement of a scheme pursuant to which affected township voters would maintain control over the fate of the properties on which they lived, see subsection 34(5), while township and city governments would make decisions concerning vacant properties containing no voters, see subsections 34(4) and (8).

It is undisputed that the annexation area contained a significant portion of undeveloped property owned by the Harbor Companies. From the maps attached to the petitions, it appears that approximately one-half of the annexation area consisted of undeveloped and vacant land. None of the exceptions within § 34 explicitly details an annexation procedure applicable to an annexation area containing both vacant and

inhabited lands. Although the township repeatedly refers to "vacant land," we note that § 34 nowhere contains this term.

The instant dispute centers on whether land containing both registered electors and vacant stretches of property may constitute a single *"area* to be annexed" under subsection 34(5). (Emphasis added.) Subsection 34(5) plainly contemplates that at least some registered electors will reside within the annexation area, but otherwise contains no qualifying language whatsoever suggesting that the annexation area must be limited to the parcels of land occupied by registered voters and cannot encompass unimproved or vacant parcels of land. Had the Legislature intended to limit the application of subsection 34(5) to properties fully occupied by registered electors, it presumably would have drafted subsection 34(5) much more narrowly. We will not read into the Legislature's incorporation of the broad term "area"[5] a vacancy exception that does not otherwise exist.

We reject the township's suggestion that subsection 34(4), which provides for the accomplishment of annexation pursuant to approval by a charter township board and a majority vote of a city council, governed the annexation in this case. By its plain terms, subsection 34(4) applies "if a qualified elector does not reside in the territory proposed to be annexed . . . ." Because in this case qualified electors undisputedly did reside in the territory proposed for annex-

---

[5] The Legislature did not more specifically define "area," which appears in § 34 together with the terms "portion" (in subsection 34[5]) and "territory" (in subsection 34[4]). Dictionary definitions of the term "area" reflect a broad meaning. See *Random House Webster's College Dictionary* (1997) (defining "area" as "an extent of space or surface," "a geographical region," or "a piece of unoccupied ground").

ation, we find misplaced the township's arguments premised on subsection 34(4).

The township also misreads subsection 34(8) to the extent the township suggests that this subsection governs annexation of vacant land. Subsection 34(8) simply contains no language explicitly addressing annexation of occupied land or vacant land, but describes that a common boundary between a township and city can "be adjusted by resolution . . . of each of the respective governing bodies" following "90 days' notice to *property owners in the area* proposed for the boundary adjustment . . . ." (Emphasis added.) We note that the reference to "property owners" within subsection 34(8) suggests the Legislature's recognition that an "area" could encompass properties employed for various purposes, including commercial and industrial uses, and on which registered voters might not reside. The broad meaning of "area" within subsection 34(8) appears consistent with the broad scope of "area" within subsection 34(5).

We conclude that pursuant to subsection 34(5) an annexation area containing registered electors may also encompass undeveloped lands and other portions of land otherwise not containing registered electors. Accordingly, the circuit court properly granted summary disposition of this claim of the township pursuant to MCR 2.116(C)(10).

III

The township next argues that the circuit court should have set aside the county clerk's order certifying the petitions and enjoined the September 11, 2001, election before it occurred. The circuit court held that should the annexation succeed, the township could

bring a quo warranto action to challenge the election. According to the township, the circuit court erred in ignoring the preelection availability of injunctive relief to prevent an illegal election, and deprived it of a remedy by limiting its available relief to the post-election quo warranto action while at the same time holding that the September 11 election would cure any petition defects.[6]

"Injunctive relief is an extraordinary remedy that issues only when justice requires, there is no adequate remedy at law, and there exists a real and imminent danger of irreparable injury." *Jeffrey v Clinton Twp*, 195 Mich App 260, 263-264; 489 NW2d 211 (1992). The decision whether to grant injunctive relief rests within the sound discretion of the trial court. *Id.* at 263.

The circuit court declined to enjoin the September 11 annexation election on the basis that "the Quo Warranto action provides [the township] with an adequate remedy at law." The Legislature provided as follows with respect to a quo warranto[7] action:

> (1) An action may be brought in the circuit court of any county of this state whenever it appears that material fraud or error has been committed at any election in such county at which there has been submitted any constitutional amendment, question, or proposition to the electors of the state or any county, township, or municipality thereof.
>
> (2) Such action shall be brought within 30 days after such election by the attorney general or the prosecuting attorney of the proper county on his own relation, or on the relation

---

[6] We note that our careful review of the circuit court's opinion and order reveals no hint by the court that a September 11 election would cure any petition defects.

[7] Black's Law Dictionary (7th ed) defines "quo warranto" as "[a] common-law writ used to inquire into the authority by which a public office is held or a franchise is claimed."

of any citizen of said county without leave of the court, or by any citizen of the county by special leave of the court or a judge thereof. Such action shall be brought against the municipality wherein such fraud or error is alleged to have been committed.

(3) After such action is brought the procedure shall conform as near as may be to that provided by law for actions for quo warranto. [MCL 600.4545.]

The circuit court rightly expressed concern regarding its interference with the electoral process. In considering the propriety of a circuit court injunction that prevented the occurrence of an election regarding certain proposed amendments to the Detroit City Charter, this Court restated the following general principles governing its analysis:

Because the injunction issued in this case does not merely affect the rights of private parties, but the right of the citizens of the City of Detroit to vote on a proposal by their elected charter revision commission, overlain on these basic elements [for injunctive relief] is another. Our Supreme Court has stated it as follows:

" 'Although there is authority to the contrary, the general rule is that an injunction will not issue to prevent the holding of an election whether or not the election is illegal, and that this is so whether the election relates to the filling of public office or other matters, such as changes in boundaries of political subdivisions and kindred matters.' " [*Senior Accountants, Analysts & Appraisers Ass'n v Detroit*, 218 Mich App 263, 270; 553 NW2d 679 (1996), quoting *Attorney General v Ingham Circuit Judge*, 347 Mich 579, 583; 81 NW2d 349 (1957) (quoting 43 CJS, Injunctions, § 115[b], p 644).]

We thus consider the propriety of the township's request for injunctive relief in light of the foregoing principles.

We conclude that the circuit court correctly declined to enjoin the September 11 election because a postelection quo warranto action constituted an adequate legal remedy available to the township. In reaching its decision, the circuit court astutely relied on *St Joseph Twp v Berrien Co Supervisors*, 363 Mich 295; 109 NW2d 826 (1961), which we find precisely on point with the instant case and thus dispositive of the township's claim of entitlement to injunctive relief. In *St Joseph Twp*, the plaintiff township filed suit to enjoin the county board of supervisors and the city of St. Joseph from scheduling and holding an election regarding the annexation of property from the township to the city. The township alleged the "invalidity of necessary statutory procedures taken prior to the questioned election, and fraudulent participation of 2 city officials in a conspiracy designed to bring about annexation of the involved parcels for the benefit of a housing corporation; the 2 officials being members of the directorate thereof." *Id.* at 296-297. The trial court dismissed the township's action five days before the scheduled annexation election, which occurred as planned and resulted in approval of the annexation measure. *Id.* at 2970. On the township's appeal of the dismissal of its action, the Michigan Supreme Court agreed with the trial court's determination that the township had an adequate remedy at law:

> The chancellor's principal reason for dismissal was that of adequacy of a legal remedy under the statute. He was right. The conclusion receives support by the fact, shown in the present record, that the plaintiff township and its supervisor have, since conduct of the election and within the allowed period, filed under the statute an information in the nature of quo warranto to test the validity of such election. [*Id.* at 297 (citations omitted).]

The Supreme Court affirmed the trial court's dismissal of the township's action seeking injunctive relief. *Id.* at 298.

Because the township in this case had the right to initiate a legal challenge to the September 11, 2001, annexation pursuant to MCL 600.4545, we conclude that the circuit court did not abuse its discretion in dismissing the township's request for preelection injunctive relief.

IV

The township further challenges the validity of the annexation petitions, arguing that they did not comport with several statutory petition requirements and were not signed by the circulators of the petitions. The circuit court granted defendants summary disposition of the township's claim that the petitions were illegal, concluding that "any technical deficiencies in the petitions are not material and will not preclude the election." We review de novo the circuit court's summary disposition ruling and the legal question whether the petitions comported with applicable statutory requirements. *Spiek v Dep't of Transportation*, 456 Mich 331, 337; 572 NW2d 201 (1998); *Saginaw Co*, *supra.*

Section 2a of the Charter Township Act, MCL 42.2a, requires that the circulation and signature of petitions for annexation pursuant to MCL 42.34(5) must comply with § 488 of the Michigan Election Law, MCL 168.488. Section 488 of the Michigan Election Law further explains that the circulation and signature of "a petition to place a question on the ballot before the electorate of a political subdivision" are subject to the

requirements of MCL 168.482(1), (4), (5), and (6). These relevant subsections of MCL 168.482 provide as follows:

(1) Each petition under this section shall be 8½ inches by 14 inches in size.

\*     \*     \*

(4) The following statement shall appear beneath the petition heading:

"We, the undersigned qualified and registered electors, residents in the city township (strike 1) of . . in the county of.., state of Michigan, respectively petition for (amendment to constitution) (initiation of legislation) (referendum of legislation) (other appropriate description)."

(5) The following warning shall be printed in 12-point type immediately above the place for signatures, on each part of the petition:

WARNING

A person who knowingly signs this petition more than once, signs a name other than his or her own, signs when not a qualified and registered elector, or sets opposite his or her signature on a petition, a date other than the actual date the signature was affixed, is violating the provisions of the Michigan election law.

(6) The remainder of the petition form shall be as provided following the warning to electors signing the petition in section 544c(1). In addition, the petition shall comply with the requirements of section 544c(2).

The portion of MCL 168.544c(1) at issue in this case prescribes petition content regarding its circulation. Subsection 544c(1) sets forth that a petition shall contain the following relevant language:

CERTIFICATE OF CIRCULATOR

The undersigned circulator of the above petition asserts that he or she is qualified to circulate this petition and that each signature on the petition was signed in his or her pres-

ence; and that, to his or her best knowledge and belief, each signature is the genuine signature of the person purporting to sign the petition, the person signing the petition was at the time of signing a qualified registered elector of the city or township listed in the heading of the petition, and the elector was qualified to sign the petition.

\*      \*      \*

Warning—A circulator knowingly making a false statement in the above certificate, a person not a circulator who signs as a circulator, or a person who signs a name other than his or her own as circulator is guilty of a misdemeanor.

The instant annexation petitions undisputedly contained several variations from the statutorily prescribed language.[8] The township suggests that the following failures of the petitions to comply with the strict statutory requirements rendered them invalid: (1) while MCL 168.482(4) requires that the petition's introduction identify the undersigned as qualified and registered *electors*, the petitions in this case identified the undersigned as qualified and registered *residents*; (2) subsection 482(4) provides that the petition's signers "respectively petition for [an election]," but the petitions in this case omitted the word "petition;" (3) in contravention of the requirement within subsection 544c(1) that the petition's circulator verify "the *genuine* signature of the person *purporting* to sign the petition" (emphasis added), the instant petitions instead certified that each signature was "the signature of the person *proposing* to sign the petition" (emphasis added); (4) while subsection 544c(1)

---

[8] Whether the undisputed facts regarding the petitions demonstrate substantial compliance with the relevant statutory requirements appears to be a legal question that this Court reviews de novo.

requires that the petition's circulators state their "Complete Residence Address," the annexation petitions denoted only the circulators' "Complete Address;" (5) subsection 482(5) provides that the petition must warn that an individual may not knowingly sign "this petition more than once," but the petitions in this case warned that a person should not "knowingly sign *the* petition more than once" (emphasis added); (6) instead of warning a "circulator" against submitting false information, the petitions referred to a "circular"; and (7) the annexation petitions did not contain warning language in 12-point boldface type as required by subsection 544c(1).

"As a general principle, all doubts as to technical deficiencies or failure to comply with the exact letter of procedural requirements are resolved in favor of permitting the people to vote and express their will on any proposal subject to election." *Meridian Charter Twp v East Lansing*, 101 Mich App 805, 810; 300 NW2d 703 (1980); see also *Settles v Detroit City Clerk*, 169 Mich App 797, 802-803; 427 NW2d 188 (1988) (restating the same principle from *Meridian*). "Matters of concern to one inquiring as to the validity of petitions would be whether the requisite number of signatures required by the statute, in this case 20 percent of the electors of the [annexation area] are present," that circulation of petitions occurred only within the affected area, that the petitions bear the circulators' names and signatures, and that the petition language appears "in sufficiently clear terms so that those signing the petition can be assumed to have understood to what it was they were appending their signatures." *Id.* at 809-810.

Before considering whether the instant petitions substantially complied with the applicable provisions of the Michigan Election Law, we note that we do not find persuasive the township's efforts to distinguish *Meridian* from the instant case. The township correctly asserts that the relevant Michigan Election Law provisions clearly and unambiguously require that various components shall appear within a petition for annexation. However, the township has failed to direct our attention to any section of the Michigan Election Law or any other legislative act suggesting that the filing of a technically imperfect petition necessarily precludes an election regarding the matter therein addressed. The township points only to statutes providing that an individual who violates the Michigan Election Law has committed a criminal misdemeanor. MCL 168.544c(7), (8).

Although the township further suggests that this Court in *Meridian* did not consider the present Michigan Election Law requirements, our reading of *Meridian* makes clear that this Court did contemplate that the petitions there involved may not have comported exactly with the letter of then existing and applicable statutory provisions. See *Meridian, supra* at 809 (noting the defendant county clerk's determination of the annexation petitions' validity against "the home rule cities act, which contain specifications for the form, circulation, and notarization of petitions relating to election matters," and that "[n]umerous statutes in this state deal with the form of petitions and the manner by which signatures on petitions are checked for validity"). The *Meridian* Court clearly recognized the existence of many statutory petition requirements, but nonetheless applied the substantial compliance

doctrine. *Id.* at 809-810. Accordingly, we also apply the doctrine in this case involving imperfect petitions, absent the Legislature's instruction that a petitioned-for election will be precluded unless the initiating petitions exactly match the Michigan Election Law requirements for form and content.

The instant annexation petitions substantially complied with §§ 482 and 544c of the Michigan Election Law. With respect to the first violation alleged by the township above, we observe that the petitions contained a capitalized "WARNING" section, above the petitions' signature lines, advising the prospective signers that a violation of the election laws would occur if someone signed the petition "when not a qualified and registered elector." Furthermore, as will be discussed in part V of this opinion, those who signed the annexation petitions in fact were properly registered electors. Regarding the second violation alleged by the township, we find that the omission of the word "petition" from the statutorily required statement that signers "respectively petition for an election" clearly constituted an oversight that would have confused no one regarding the document they were signing, especially given the presence of the capitalized word "PETITION" at the top of the documents and the documents' repeated references to "petition" thereafter. In regard to the third alleged violation, we note that part of the capitalized warning above the signers' names indicates that signing another person's name is a violation of the Michigan Election Law. Moreover, the township has failed to demonstrate that the missing word "genuine" affected the genuineness of any petition signatures and has failed to explain how the instant petitions' employment of the word "propos-

ing," in lieu of "purporting," made any difference in this case. With respect to the fourth alleged violation, we observe that the township also failed to indicate that the missing word "Residence" between the words "Complete Address" led to any circulator's inclusion of an invalid residence address. The circulators' addresses matched the residence addresses listed when the circulators also signed the petitions as petitioners, and the county clerk's office verified those addresses when it certified that the petitions contained the names of a sufficient number of registered voters living within the annexation area. Regarding the fifth alleged violation, the township offers no suggestion why the instant petitions' warning against signing "*the* petition," instead of "th*is* petition," should affect the petitions' validity or lead to any confusion. We find this variation from the Michigan Election Law immaterial, and we also find immaterial the obvious typographical error in the misspelling of "circulator" as "circular," the township's sixth alleged violation. We lastly note that to the extent the warning portions of the petitions did not appear in bold print, the warnings did appear entirely in capital letters that clearly set the warnings apart from the remainder of the petitions. See *Kadans v Wayne Co Clerk*, 363 Mich 306, 308; 109 NW2d 788 (1961) (invoking the substantial compliance doctrine where the petitions did not comport with the statutory requirement regarding petition size). In light of these facts, we find that the petitions were "in sufficiently clear terms so that those signing the petition can be assumed to have understood to what it was they were appending their signatures." *Meridian, supra* at 810.

With respect to the other elements of substantial compliance discussed in *Meridian* as will be discussed further in part V of this opinion, the petitions properly contained the signatures of at least twenty percent of the registered electors residing within the annexation area, were circulated within the annexation area of the township, and contained the names and signatures of the petition circulators. *Meridian, supra* at 809-810. Regarding the township's contention that employees of the developer unlawfully brought petitions to annexation area residents but then avoided signing the petitions as circulators (instead having the residents who signed as petitioners also sign as circulators), we note that the township has abandoned this argument by failing to cite any authority for the proposition that anyone who participates in distributing petitions qualifies as a circulator who must meet the requirements of MCL 168.544c(3). *Byrne v Schneider's Iron & Metal, Inc*, 190 Mich App 176, 183; 475 NW2d 854 (1991). The township presented no authority to establish that employees of the developer who did not reside within the annexation area stood in the role of circulators when they gave petitions to other individuals who declared themselves to be circulators.

We conclude that the circuit court properly found substantial compliance by the annexation petitions, and correctly refused to permit the minor defects alleged by the township to preclude the September 11, 2001, annexation election.

V

The township next contends that the annexation petitions did not contain the signatures of twenty per-

cent of the required electors residing within the annexation area because four petitioners, who registered to vote in the township near the same time that they signed petitions, were not qualified and registered electors, as required by MCL 168.482(4). The township explains that although the four petitioners had registered to vote by the time they signed the petitions, they were not *qualified* electors because they had not been registered to vote for at least thirty days at the time they signed the petitions.[9] The township has raised another issue of statutory interpretation that we review de novo. *Saginaw Co, supra.*

We initially address the township's assertion that the Oakland County Clerk did not properly certify the petitions because the clerk failed to verify the signatures of the petitioners by comparing them with the township's records, which contained signatures of its registered voters. We find this claim wholly lacking merit. First, the township's claim ignores the uncontradicted deposition testimony of election director Hammond that on July 12, 2001, she telephoned the township clerk's office and specifically requested that the township fax copies of their "master cards" containing voter signatures for comparison with the petition signatures, but that the township never responded to her request. We cannot assign culpability to the county clerk when the township undisputedly failed to cooperate with the investigation that the

---

[9] We do not address the issue whether the signer of a petition may withdraw his signature therefrom because the township cites no authority for this proposition, *Byrne, supra,* and because we find it unnecessary to address this issue to resolve the instant dispute. We note, however, the opinion of Michigan's Attorney General that signers of an annexation petition could not withdraw their signatures after the petitions had been filed. 1 OAG, 1957, No 3,180, p 523 (December 2, 1957).

county clerk requested. Second, in light of the fact that the petition signatures and voter registration application signatures of the four challenged petitioners appear identical, and the township does not argue otherwise, the township has failed to show that the county clerk's comparison of the petition signatures with the township's master cards would have led to a rejection of the petitions.

We reject the township's contention that the four challenged petitioners had to be both qualified and registered electors on the day that they signed the annexation petitions. The township premises its argument on MCL 168.482, which as we already discussed comprises a section of the Michigan Election Law that prescribes general requirements regarding the form and content of petitions to initiate legislation or for referendums regarding legislation. According to MCL 42.2a, a petition for annexation of charter township land under MCL 42.34(5) is subject to MCL 168.488. Subsection 488(2) refers to MCL 168.482(4) which sets forth standardized petition language, including, " 'We, the undersigned qualified and registered electors, . . . respectively petition for . . . .' " The township cites MCL 168.10 for the proposition that the four challenged petitioners were not "qualified electors" because no indication existed that they had lived in the township for at least thirty days before signing the annexation petitions.

We are not persuaded by the township's argument because it ignores the plain language of MCL 42.34(5) the subsection pursuant to which the instant annexation petitions were circulated. Subsection 34(5) clearly and unambiguously contemplates that annexation of charter township property to a contiguous

city may occur "upon the filing of a petition with the county clerk which petition is signed by 20% of the *registered electors* in the area to be annexed . . . ." (Emphasis added.) Immediately thereafter, MCL 42.34(5) requires for a successful annexation to occur the "approval [of the proposed annexation] by a majority of the *qualified and registered electors* voting on the question . . . ." (Emphasis added.) In light of the Legislature's inclusion of the adjectives "qualified and registered" to describe the electors eligible to *vote* regarding a proposed annexation of charter township property, we cannot presume that the Legislature inadvertently omitted the word "qualified" from another portion of the same statutory subsection when it provided that simply "registered electors" within an annexation area could *sign petitions* for annexation.[10] *Farrington v Total Petroleum, Inc*, 442 Mich 201, 210; 501 NW2d 76 (1993) (explaining that courts cannot assume the Legislature inadvertently omitted language that it employed in other parts of a statute). To the extent the township raises a legitimate conflict between MCL 42.34(5), the specific statute pursuant to which the petitions were circulated to annex charter township property to Pontiac, and MCL 168.482(4), a subsection of the Michigan Election Law prescribing general and standardized petition language, we must conclude that the more specific stat-

---

[10] We note that according to Const 1963, art 2, § 9, "The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum," and that to invoke these powers "petitions signed by a number of *registered electors*" must be filed. (Emphasis added.) We further note that MCL 117.9(7)(c) similarly contemplates potential annexation on the submission to the state boundary commission of a petition signed by twenty percent of "the *registered electors* who reside in the area proposed for annexation." (Emphasis added.)

ute controls. *Gebhardt v O'Rourke*, 444 Mich 535, 542-543; 510 NW2d 900 (1994); *People v Ellis*, 224 Mich App 752, 756; 569 NW2d 917 (1997) (explaining that the more specific statute is treated as an exception to the general one).

We further find that the four petitioners challenged by the township were properly registered electors according to the Michigan Election Law. Section 492 of the Michigan Election Law prescribes the requirements for registering as an elector:

> Every person who has the following qualifications of an elector, *or who will have those qualifications at the next election or primary election,* shall be entitled to be registered as an elector in the township . . . in which he or she resides. The person shall be a citizen of the United States; not less than 18 years of age; a resident of the state for not less than 30 days; and a resident of the township . . . on or before the thirtieth day before the next regular or special election or primary election. [MCL 168.492 (emphasis added).]

According to the plain language of § 492, the fact that the four challenged petitioners undisputedly registered as township voters approximately two months before the September 11, 2001, annexation election[11] "entitled [them] to be registered as [] elector[s] in the township . . . ." Nothing within § 492 hints that the challenged petitioners had to wait thirty days before exercising the petition rights of a registered elector. Because the challenged petitioners met the registered

---

[11] To the extent the township suggests that the short time between the four challenged petitioners' voter registrations and their signing of the petitions should raise some suspicion of election manipulation, we note that the township has provided no authority for the proposition that organized voter registration drives are inherently suspicious or somehow illegal.

elector requirements within MCL 168.492, they properly signed the petitions for annexation pursuant to MCL 42.34(5).

We conclude that the circuit court correctly determined as a matter of law that the annexation petitions contained the signatures of at least twenty percent of the registered electors living within the annexation area, and properly granted summary disposition of the township's claim to the contrary.

VI

The township further avers that the circuit court improvidently dismissed its claim that MCL 42.34(5) violates constitutional equal protection guarantees by permitting only voters living within the area of the township to be annexed, and not the larger number of voters living elsewhere within the township, to cast ballots in an annexation election. The township alleges that voters living outside the annexation area have an interest in voting in the annexation election because a successful annexation will deprive them "of valuable and unique property in the Township and the tax base from that property that supports the services available to all Township residents." The township also theorizes that "there is no rational basis for allowing some electors [within the annexation area] to vote on the issue of annexation of the vacant land to Pontiac, but depriving the remaining thousands of [township] electors, who have the same non-relationship to that vacant land, of the right to vote on the annexation issue."

We review de novo constitutional questions of equal protection. *Saginaw Co, supra* at 222. A

rational basis test governs our analysis of an alleged equal protection violation when, as in this case, the proponent of the equal protection argument does not belong to a protected class and his fundamental rights are not involved. *Yaldo v North Pointe Ins Co*, 457 Mich 341, 349; 578 NW2d 274 (1998). Under the rational basis test, the challenged statute must be upheld if it furthers a legitimate governmental interest and if the classification rationally relates to achieving the interest. The party asserting the equal protection violation bears the heavy burden of showing that the statutory classification qualifies as arbitrary and irrational, given the objective of the statute. *Id.*

We note initially with respect to the township's equal protection argument that the township has failed to demonstrate that it or its residents possessed a property or liberty interest that was affected by the annexation of charter township property pursuant to MCL 42.34(5). *Rudolph Steiner School of Ann Arbor v Ann Arbor Charter Twp*, 237 Mich App 721, 740; 605 NW2d 18 (1999). "No city, village, township or person has any vested right or legally protected interest in the boundaries of such governmental units." *Midland Twp v State Boundary Comm*, 401 Mich 641, 664; 259 NW2d 326 (1977); see also *Rudolph Steiner School, supra* at 736, 741. " 'The fixing of municipal boundaries is generally considered to be a legislative function.' " *Shelby Charter Twp v State Boundary Comm*, 425 Mich 50, 56, n 3; 387 NW2d 792 (1986) (citation omitted); see also *Midland Twp, supra* at 664-666.

Moreover, the annexation referendum provisions within MCL 42.34(5) further a legitimate governmental interest and rationally relate to achieving the inter-

est. In *Midland Twp, supra* at 666, the Supreme Court considered a township's assertion that "it is violative of the Equal Protection Clause to provide for a referendum where more than 100 persons reside in the territory to be annexed and deny a referendum where 100 persons or fewer reside in the territory." The Supreme Court rejected the equal protection claim on the basis that "the challenged classification bears a substantial relation to the object of the legislation: providing a means appropriate to the resolution of disagreements concerning annexation of territory to a city." *Id.* at 666-667. We find that the same rational purpose supports the Legislature's decision to permit within MCL 42.34(5) annexation of charter township property by separate majority votes of the qualified and registered electors living within the annexation area and eligible voters residing in the annexing city or village.[12]

---

[12] The initially proposed version of the statutory subsection that ultimately became current MCL 42.34(5) required that a portion of a charter township could only be annexed on approval by a " 'majority of the qualified and registered electors voting on the question in . . . the [entire] township from which a portion is to be annexed.' " *Shelby Charter Twp, supra* at 63. The final version of the provision that became current subsection 34(5) represented a legislative compromise between an interest in protecting charter townships from annexations and the competing concerns, among others, that "such a strong shield against annexations was not good public policy" and that the initial version of what became subsection 34(5), "essentially gave charter townships a veto power over all annexations of their territory, even in cases in which the majority of electors in the city seeking to annex, and in the territory proposed to be annexed, voted in favor of the annexation." *Shelby Charter Twp, supra* at 62-63, 64, 67, n 12. The legislative history chronicled in *Shelby Charter Twp, supra* at 61-69, supports our conclusion that MCL 42.34(5) represents "a means appropriate to the resolution of disagreements concerning annexation of territory to a city." *Midland Twp, supra* at 667.

Accordingly, we conclude that the circuit court properly granted summary disposition of the township's equal protection claim.

VII

The township next argues that the annexation area constituted a "gerrymandered" parcel that did not satisfy the contiguity requirement applicable to municipal annexations, which element of contiguity incorporates elements of reasonable compactness and boundary regularity. We review de novo the meaning of "contiguity" within MCL 42.34(5), *Saginaw Co, supra* at 214, and the circuit court's summary disposition ruling with respect to this issue. *Spiek, supra.*

While MCL 42.34(5) states that "a portion of a charter township contiguous to a city or village may be annexed," the statute does not more specifically define the element of contiguity. "Contiguous" generally means "[t]ouching at a point or along a boundary; adjoining." Black's Law Dictionary (7th ed). The maps of the annexation area plainly demonstrate that it consists of an area of the township that adjoins Pontiac.

The township relies on *Owosso Twp v Owosso*, 25 Mich App 460, 467; 181 NW2d 541 (1970), for the proposition that "included in the requirement of contiguity are the elements of reasonable compactness and regularity of boundary so as to insure that the annexed and annexing territories become an unbroken mass which can function effectively as a single unit rather than as an armed monster with only minimally-connected appendages." The township ignores, however, that in affirming this Court's deci-

sion in *Owosso Twp*, the Supreme Court explicitly recognized that "the judicial requirement of 'contiguity' in municipal annexation" applied by this Court had been superseded by the Legislature's enactment of MCL 117.9. *Owosso Twp v Owosso*, 385 Mich 587, 588, 590; 189 NW2d 421 (1971). The township presents neither argument nor authority for the proposition that the Legislature intended to reincorporate into MCL 42.34(5) the superseded, broad concept of contiguity set forth in this Court's *Owosso Twp* opinion.[13] We decline to further consider this question because "[i]t is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Goolsby v Detroit*, 419 Mich 651, 655, n 1; 358 NW2d 856 (1984); see also *Silver Creek Twp v Corso*, 246 Mich App 94, 99; 631 NW2d 346 (2001) (explaining that an issue is not properly presented for review where the party asserting it provides little or no citation of relevant supporting authority).

---

[13] The township cites only *Pittsfield Twp v Ann Arbor*, 86 Mich App 229, 233; 274 NW2d 466 (1978), in which this Court, in a case involving MCL 117.9, applied the factors "traditionally" applied by Michigan courts in annexation actions, including "contiguity, gerrymandering, and reasonable compactness of boundaries." In *Pittsfield Twp*, this Court relied on *Owosso Twp, supra*, 25 Mich App 460, and *Saginaw v Saginaw Co Bd of Supervisors*, 1 Mich App 65; 134 NW2d 378 (1965). We do not find *Pittsfield Twp* persuasive authority for continuing to apply a broad concept of continuity, however, in light of the fact that the Court wholly ignored the Michigan Supreme Court's earlier recognition that the judicial contiguity requirement had been superseded. *Owosso Twp, supra*, 385 Mich 588.

VIII

The township lastly contends that the circuit court erroneously granted a protective order preventing it from deposing the signers of the annexation petitions. The township apparently sought to depose ten signers of the petitions[14] regarding the circumstances of, and their motivations in, signing the petitions. The township alleged that evidence existed "that, at the very least, gives the impression that [the Harbor Companies] used improper or illegal tactics to obtain the signatures on the petitions." We review for an abuse of discretion the circuit court's decision whether to grant a protective order. *In re Pott*, 234 Mich App 369, 373; 593 NW2d 685 (1999); *Mercy Mt Clemens Corp v Auto Club Ins Ass'n*, 219 Mich App 46, 55; 555 NW2d 871 (1996).

The circuit court granted a protective order against discovery from the petition signers pursuant to MCR 2.302(C)(1), which provides as follows:

> Protective Orders. On motion by a party or by the person from whom discovery is sought, and on reasonable notice and for good cause shown, the court in which the action is pending may issue any order that justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following orders:
>
> (1) that the discovery not be had[.]

"While Michigan is strongly committed to open and far-reaching discovery, a trial court must also protect

---

[14] The township sought to depose all signers of the petitions with the exception of the two allegedly nonresident signers that the parties have treated as "withdrawing" their signatures.

the interests of the party opposing discovery so as not to subject that party to excessive, abusive, or irrelevant discovery requests." *In re Hammond Estate*, 215 Mich App 379, 386; 547 NW2d 36 (1996) (citations omitted).

We initially note that with respect to at least seven of the petition signers that the township sought to depose, the township failed even to demonstrate the relevance of its desired discovery. MCR 2.302(B)(1). The township has supplied no basis whatsoever for taking the depositions of the three petitioners who signed petitions long after registering to vote and who were not identified in any affidavits or news accounts as possibly signing under the developer's influence. Regarding the four individuals who signed petitions soon after registering to vote, as we set forth in part V of this opinion, the timing of their petition signatures within days of their voter registrations did not affect the validity of their petition signatures.

With respect to three signers of the petitions, the township claimed that evidence of their manipulation by the Harbor Companies justified the township's desire to depose not only these three petitioners, but also the remaining seven petitioners, to ascertain the extent of the developer's machinations. In support of its allegations of improper influence, the township supplied (1) an affidavit from an attorney for the township who indicated that he had spoken with one signer of the petition who believed that the Harbor Companies lowered his rent in return for his petition signature, (2) an affidavit from the township's clerk who reported having a conversation with a second signer of the petition who believed he had been tricked into signing, and (3) an undated newspaper

article headlined "Attorneys question petition-drive tactics," which recounted a report by the spouse of a third signer of the petition that the Harbor Companies offered her husband forgiveness of back rent if her husband signed the petition. The Harbor Companies argued that the requested discovery would infringe the petitioners' First Amendment rights and provided affidavits of the two petition signers identified in the township's affidavits,[15] who averred that they signed the petitions "freely and voluntarily" without any attempted undue influence by the Harbor Companies.[16]

---

[15] We need not consider the township's unpreserved argument, raised for the first time on appeal, that MCR 2.302(C) did not authorize the Harbor Companies to request a protective order against discovery from the petition signers. *Fast Air, Inc v Knight*, 235 Mich App 541, 549; 599 NW2d 489 (1999). We note, however, that the court rule clearly and unambiguously contemplates that a protective order may issue "[o]n motion by a party."

[16] To the extent the township refers to the deposition of Craig Schubiner, a managing member of the Harbor Companies, we decline to consider these references because none of the parties separately submitted Schubiner's deposition to the circuit court for consideration. *Kent Co Aeronautics Bd v Dep't of State Police*, 239 Mich App 563, 579-580; 609 NW2d 593 (2000) (noting that this Court's review is limited to the record developed by the trial court, and that a party is not permitted to enlarge the record on appeal by asserting numerous facts not presented at the trial court), aff'd sub nom *Byrne v Michigan*, 463 Mich 652; 624 NW2d 906 (2001). Schubiner's deposition appears in the lower court file along with several other proposed exhibits that the township attached to an unsuccessful motion in this Court to enlarge the record on appeal, which was filed together with the township's interlocutory application for leave to appeal the circuit court's denial of the township's request for preliminary injunctive relief. This Court denied the township's motions. *Charter Twp of Bloomfield v Oakland Co Clerk*, unpublished order of the Court of Appeals, entered August 31, 2001 (Docket No. 236116).

We likewise decline to consider an affidavit by the petition signer who was the subject of the newspaper article. While the Harbor Companies attached this affidavit to their brief on appeal, it does not appear that the affidavit was filed in the circuit court.

Evidence of the Harbor Companies' manipulation would have lent support to the fraud count of the township's first amended complaint. However, the township sought invasive discovery from the petition signers and provided no cognizable or direct evidence to justify its requests to depose them, especially with respect to at least seven of the signers.[17] In light of (1) the signers' powerful interest in participating in political speech protected by the First Amendment without the fear of subsequently facing adversarial questions under oath regarding their motives in doing so and (2) the fact that the hearsay and multiple-layered hearsay bases for the township's requested discovery were wholly contradicted by the direct, sworn affidavit testimony of the petition signers themselves, we cannot conclude that the circuit court abused its discretion in finding good cause to impose a protective order against the "over-reaching" discovery sought by the township. MCR 2.302(C); *Dep't of Transportation v Randolph*, 461 Mich 757, 768; 610 NW2d 893 (2000) (explaining that an abuse of discretion occurs only when a result is " ' "so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias" ' "), quoting *Alken-Ziegler, Inc v Waterbury Headers*

---

[17] The fact that the township offered to depose the signers by written questions did not render the questions any less intrusive. The township promulgated at least ten questions for all ten petition signers, including, "Who gave you the petition . . . ? What did they say to you? And why did you sign?" We observe that the media already had taken note of the circumstances of the petition signings and presumably would have been interested to discover the answers to the questions proposed by the township.

*Corp*, 461 Mich 219, 227; 600 NW2d 638 (1999), quoting *Spalding v Spalding*, 355 Mich 382, 384-385; 94 NW2d 810 (1959). Under the circumstances, we will not second-guess the circuit court's apparent determination that "the discovery requested by appellants had taken on the appearance of a 'fishing expedition . . . .' " *In re Hammond Estate, supra* at 386.

IX

We conclude that the circuit court properly granted summary disposition of the township's complaint because the annexation petitions complied with Michigan law and did not contain any material defects. We reiterate that the circuit court wisely declined the township's invitation to enjoin the annexation election.

> The wisdom of the principle of judicial restraint expressed by our Supreme Court in [*Ingham Circuit Judge, supra*] is self-evident; *the notion that our courts may precipitously intervene in the political arena and preempt a vote of the people is inconsistent with both the role of the courts and the principles of our democracy.* [*Senior Accountants, supra* at 270 (emphasis added).]

Affirmed.