STAND UP FOR DEMOCRACY v SECRETARY OF STATE

Docket No. 310047. Submitted May 17, 2012, at Detroit. Decided June 8,
2012, at 9:00 a.m. Convening of special panel declined, 297 Mich
App 801. Reversed, 492 Mich 588.

Stand Up For Democracy, a ballot question committee, filed an
original action in the Court of Appeals against the Secretary of
State and the Board of State Canvassers, seeking a writ of
mandamus directing the board to certify a referendum petition the
committee had circulated and directing the Secretary of State to
take all appropriate action to ensure that the referendum was
placed on the November 2012 general election ballot. Citizens for
Fiscal Responsibility, a ballot question committee opposing the
referendum, moved to intervene. The Court granted the motion to
intervene in an unpublished order, entered May 11, 2012 (Docket
No. 310047). Stand Up For Democracy sought a referendum on the
Local Government and School District Fiscal Accountability Act,
2011 PA 4, MCL 141.1501 *et seq.*, commonly known as the
"emergency financial manager law," and submitted more than
24,000 referendum petition sheets containing 226,339 signatures
to the Bureau of Elections. The bureau determined that more than
enough valid signatures had been submitted to have the question
placed on the ballot. Citizens for Fiscal Responsibility timely
challenged the petition before the board on several grounds,
including that the type size of the heading on the petition did not
comply with MCL 168.482(2), which requires that referendum
petition headings be printed in capital letters in 14-point boldfaced
type. Two members of the board voted in favor of a motion to
approve the petition. Two members of the board voted against the
motion. Accordingly, the motion failed and the petition was not
certified. Stand Up For Democracy subsequently filed its com-
plaint for a writ of mandamus in the Court of Appeals and moved
for immediate consideration of the complaint and oral argument.
The Court granted the motions in an unpublished order, entered
May 7, 2012 (Docket No. 310047).

The Court of Appeals *held*:

The petition heading was not printed in 14-point type. Certifi-
cation is compelled, however, under the decision in *Bloomfield*

*Charter Twp v Oakland Co Clerk*, 253 Mich App 1 (2002), because the petition substantially complied with the 14-point-type requirement. *Bloomfield* was wrongly decided but must be followed pursuant to MCR 7.215(J)(1). Were it not for *Bloomfield*, the Court would have held that the petition was invalid. Convening a special panel of the Court of Appeals was requested under MCR 7.215(J)(3) for the purpose of resolving the conflict that would have been created except for the provisions of MCR 7.215(J)(1).

1. Although MCL 168.544d permits the Secretary of State to prescribe a petition form for the countywide circulation of referendum petitions, like the petition involved in this case, the statute further provides that the prescribed form must be in substantial compliance with MCL 168.482, 168.544a, or 168.544c, whichever is applicable. The format that has been prescribed by the Secretary of State with regard to a petition subject to MCL 168.482, the statute applicable to the petition in this case, mandates the use of the exact type size and text format as mandated by MCL 168.482(2), which provides that a petition heading shall be printed in capital letters in 14-point boldfaced type. The term "shall" denotes mandatory conduct.

2. Substantive constitutional challenges regarding the validity of a ballot proposal are premature when made before the voters adopt the proposition in question, but challenges regarding whether a petition meets the necessary constitutional or statutory requirements are properly brought before the board certifies any petition as valid. Because Citizens for Fiscal Responsibility's challenges concern the threshold determination whether the petition meets the prerequisites for acceptance, its challenges are ripe for review.

3. The term "font" is defined as a complete assortment of type of one style and size. "Font" incorporates all the characteristics of a particular type, including the font family, such as Times New Roman, Calibri, or Arial, its size, and its style. "Font" is not a unit of measurement. Because the heading of the petition was properly in bold and in capital letters, the only dispute in this case was whether the heading was sized appropriately as 14-point type. Type that is 14-point is $^{14}/_{72}$ of an inch or 0.194 inches. Because 14-point is a unit of measurement easily determined by the use of an E-scale ruler, neither the Court of Appeals nor the board requires expert testimony to determine whether the correct measurement has been met.

4. The actual size of text varies depending on the font family chosen. For example, 14-point Calibri font measures in a different type size than 14-point Arial font. Therefore, text in a so-called

14-point font may not necessarily meet the 14-point type standard of $^{14}/_{72}$ inches. Because a heading of 14-point type is prescribed by the Secretary of State and MCL 168.482(2), text that does not measure 14 points, or $^{14}/_{72}$ inches, is insufficient under the statute. The Calibri font utilized in plaintiff's petition's heading is smaller than the prescribed 14-point-type measurement of $^{14}/_{72}$ inches and only measures 12 points on an E-scale ruler. Therefore, plaintiff's petition contains a fatal formatting defect and is invalid under the format prescribed by the Secretary of State and MCL 168.482. However, *Bloomfield* compels certification of the petition because the 12-point type of the heading is in substantial compliance with the 14-point-type heading requirement prescribed by the Secretary of State and MCL 168.482(2).

5. Under the substantial-compliance doctrine adopted in *Bloomfield*, as a general principle, all doubts regarding technical deficiencies or failure to comply with the exact letter of procedural requirements are resolved in favor of permitting the people to vote and express their will on any proposal subject to election. The doctrine also examines whether the petition language appears in sufficiently clear terms so that those signing the petition can be assumed to have understood to what it was they were appending their signatures. *Bloomfield* was wrongly decided because it failed to apply the clear and unambiguous statutory language in MCL 168.482(5) that the petition's warning language "shall" be printed in 12-point type. The Legislature's use of the word "shall" denotes mandatory conduct and a court may not ignore the Legislature's instruction of mandatory conduct or make a different policy choice than the one made by the Legislature.

6. The plain language of MCL 168.544d requires that petitions circulated countywide must strictly comply with the form requirements prescribed by the Secretary of State, who has prescribed form requirements exactly the same as those required by MCL 168.482.

7. The synopsis of the legislation involved provided by plaintiff on the petition complies with the Secretary of State's requirements for a synopsis. Where, as here, the summary of the emergency financial manager's powers are not misstated, a finding that the synopsis is adequate must follow.

8. The petition was not defective on the basis that it did not republish the prior emergency financial manager act that 2011 PA 4 repealed.

9. Citizens for Fiscal Responsibility abandoned its claims that the petition was defective on the bases that it did not republish the effective date of 2011 PA 4 and the contents of 2011 PA 9, which

was tie-barred to 2011 PA 4, because it failed to provide any authority in support of the claims.

Elements for mandamus met and Board of State Canvassers directed to certify plaintiff's petition for the ballot.

*The Sanders Law Firm P.C.* (by *Herbert A. Sanders*), *Melvin Butch Hollowell, John C. Philo,* and *Goodman & Hurwitz PC* (by *William H. Goodman* and *Julie Hurwitz*) for Stand Up For Democracy.

*Bill Schuette,* Attorney General, *B. Eric Restuccia,* Deputy Solicitor General, and *Heather S. Meingast* and *Denise C. Barton,* Assistant Attorneys General, for the Secretary of State and the Board of State Canvassers.

*Honigman Miller Schwartz and Cohn LLP* (by *John D. Pirich* and *Andrea L. Hansen*) for Citizens for Fiscal Responsibility.

Amici Curiae:

*Bill Schuette,* Attorney General, *John J. Bursch,* Solicitor General, *Richard A. Bandstra,* Chief Legal Counsel, and *Laura L. Moody* and *Mark G. Sands,* Assistant Attorneys General, for the Governor and the Attorney General.

*Mark P. Fancher, Michael J. Steinberg,* and *Kary L. Moss* for the American Civil Liberties Union Fund of Michigan.

Before: WILDER, P.J., and K. F. KELLY and RIORDAN, JJ.

PER CURIAM. In this original action, plaintiff, Stand Up For Democracy, seeks a writ of mandamus against defendants, the Michigan Secretary of State and the Michigan Board of State Canvassers (the board). Plaintiff urges this Court to direct that defendants certify for

placement on the November 2012 general election ballot a referendum of 2011 PA 4, MCL 141.1501 *et seq.*, the Local Government and School District Accountability Act, commonly known as the "emergency financial manager law." Under this Court's decision in *Bloomfield Charter Twp v Oakland Co Clerk*, 253 Mich App 1; 654 NW2d 610 (2002), which controls the outcome in this case, plaintiff's request for a writ of mandamus is warranted. However, for the reasons stated later in this opinion, we conclude that *Bloomfield* was wrongly decided, and we apply and follow it only because we are required to do so under MCR 7.215(J)(1). Therefore, in accordance with MCR 7.215(J)(2), we call for the convening of a special panel of this Court pursuant to MCR 7.215(J)(3). This judgment is issued pursuant to MCR 7.215(F)(1), and execution is stayed pending a poll of the judges of this Court pursuant to MCR 7.215(J)(3)(a).

I

A

In early 2011, the Michigan Legislature passed, and the Governor signed into law, 2011 PA 4 (the act). The act, which has the purpose of assuring the fiscal accountability of local governments, including school districts, provides for the management and control of local governments' finances in financial emergencies. Among other things, the act sets forth the duties of various officials, including the powers and duties of an emergency manager. The act became effective on March 16, 2011. See MCL 141.1501 *et seq.*

The act repealed 1990 PA 72, MCL 141.1201 *et seq.*, which also described the duties of emergency managers. It is undisputed that the act grants broader powers to emergency managers than did 1990 PA 72.

B

The Michigan Constitution reserves to Michigan voters the power of referendum to approve or reject a newly enacted law:

> The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum. The power of initiative extends only to laws which the legislature may enact under this constitution. The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds and must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at which the law was enacted. To invoke the initiative or referendum, petitions signed by a number of registered electors, not less than eight percent for initiative and five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.

*   *   *

> The Legislature shall implement the provisions of this section. [Const 1963, art 2, § 9.]

As instructed by our Constitution,[1] the Legislature prescribed the form of referendum and other petitions, which is located in MCL 168.544d and provides the following:

> Nominating petitions for the offices under this act and petitions for a constitutional amendment, initiation of

---

[1] Whereas the 1963 Constitution dictates that the Legislature shall prescribe the form and other requirements of initiative and referendum petitions, in the predecessor 1908 Constitution, the prescribed form of initiative and referendum petitions was governed by the language of the Constitution itself. See Const 1908, art 5, § 1.

legislation, or referendum of legislation or a local proposal may be circulated on a countywide form. *Petitions circulated countywide shall be on a form prescribed by the secretary of state*, which form shall be substantially as provided in [MCL 168.482, 168.544a, or 168.544c] whichever is applicable. The secretary of state may provide for a petition form larger than 8–1/2 inches by 13 inches and shall provide for identification of the city or township in which the person signing the petition is registered. The certificate of the circulator may be on the reverse side of the petition. This section does not prohibit the circulation of petitions on another form prescribed by this act. [Emphasis added.]

MCL 168.482(2), in turn, provides:

If the measure to be submitted proposes a . . . referendum of legislation, the heading of each part of the petition *shall be prepared in the following form and printed in capital letters in 14–point boldfaced type*:

\* \* \*

REFERENDUM OF LEGISLATION

PROPOSED BY INITIATIVE PETITION

[Emphasis added.][2]

Pursuant to MCL 168.544d, the Secretary of State issued a memorandum in January 2011 prescribing the requirements for initiative and referendum petitions, including the proper format, the applicable deadlines for submission, as well as signature and circulation requirements. The memorandum provided that for referendum petitions, 161,305 valid signatures[3] were required to be filed no more than 90 days after the final

---

[2] Before it was amended in 1965, § 482 required the petition heading to "be prepared in the following form and printed in capital letters in type of the *approximate* size set forth." (Emphasis added.) See 1954 PA 116.

[3] The Secretary of State's requirement is consistent with the constitutional mandate that the minimum number of signatures needed for a

adjournment of the legislative session at which the law was enacted, and that upon the certification of the filing of sufficient valid signatures, the law involved is suspended pending the outcome of the referendum at the next general election.[4] The Secretary of State's memorandum also stated, in relevant part:

> Michigan election law, MCL 168.544d, grants the Secretary of State the authority *to prescribe a petition form* for the countywide circulation of initiative and referendum petitions. MCL 168.544d further provides that *the prescribed form* must be in substantial compliance with MCL 168.544c and MCL 168.482 -- two additional provisions of Michigan election law which address the formatting of petitions.
>
> As a service to those interested in launching an initiative or referendum petition drive, the Michigan Department of State's Bureau of Elections offers its staff for consultations on the various petition formatting requirements. Upon determining through the consultation process that an initiative or referendum petition is properly formatted, it is submitted to the Board of State Canvassers for approval as to form. While Michigan election law does not require the pre-approval of an initiative or referendum petition form, *such approval greatly reduces the risk that signatures collected on the form will be ruled invalid due to formatting defects.*

\* \* \*

referendum petition is five percent of the total number of votes cast for all candidates for governor at the last preceding general election. Const 1963, art 2, § 9.

[4] This requirement is consistent with MCL 168.477(2), which provides:

For the purposes of the second paragraph of section 9 of article II of the state constitution of 1963, a law that is the subject of the referendum continues to be effective until the referendum is properly invoked, which occurs when the board of state canvassers makes its official declaration of the sufficiency of the referendum petition. The board of state canvassers shall complete the canvass of a referendum petition within 60 days after the petition is filed with the secretary of state, except that one 15-day extension may be granted by the secretary of state if necessary to complete the canvass.

Under Board of State Canvassers' policy, the attached "Printer's Affidavit" must accompany an initiative or referendum petition submitted for Board approval. The petition sponsor is responsible for having the affidavit completed.

A description of the *prescribed* initiative and referendum petition format and the pertinent provisions of the State Constitution and Michigan election law are included with this informational packet for your reference. [Emphasis added.]

In June 2011, the Secretary of State issued a follow-up memorandum, which described in detail the "PRESCRIBED FORMAT" for initiative and referendum petitions. Part I of the June 2011 document states, in pertinent part, that referendum petitions "shall" contain "[t]he full text of the legislation which would be affected by the referendum." This full text is to appear "at the top of the signature side of the petition sheet after an introduction which identifies the legislation involved." However,

[i]f there is not sufficient space at the top of the signature side of the petition sheet to print the legislation which would be affected by the referendum, the introduction shall be followed by a brief synopsis of the legislation involved and reference shall be made to the reverse side of the sheet for the full text of the legislation. The full text of the legislation which would be affected by the referendum shall appear on the reverse side of the petition sheet after an introduction which identifies the legislation involved.

In addition, the Secretary of State's standard *prescribed* format, under the subheading "Identification of Petition Type," specifies that the words "REFERENDUM OF LEGISLATION PROPOSED BY INITIATIVE PETITION" "*shall* be printed in capital letters in *14-point boldface type* on the left margin of the signature

side of the sheet or at the top of the signature side of the sheet. (MCL 168.482(2))." (Emphasis added.) Significantly, while § 544d permits the Secretary of State to prescribe a form that is in substantial compliance with § 482, in this instance, the Secretary of State's *prescribed* format did *not* permit petition type size or text that was in substantial compliance with MCL 168.482(2). Rather, the format prescribed by the Secretary of State mandated the use of the *exact* type size and text format as mandated by MCL 168.482(2).

As previously noted, the Secretary of State also required a "Printer's Affidavit" to accompany referendum petitions submitted for board approval. A sample printer's affidavit was attached to the Secretary of State's January 2011 memorandum, dictating the manner in which the printer should aver that the text of a proposed petition meets the prescribed criteria. The top of the sample printer's affidavit contains the following language:

> PROPONENTS OF INITIATIVE AND REFERENDUM PETITIONS ARE URGED TO SUBMIT A PROOF COPY OF THEIR PETITION TO THE BOARD OF STATE CANVASSERS FOR APPROVAL AS TO FORM PRIOR TO THE CIRCULATION OF THE PETITION. WHEN SUBMITTING A PETITION FORM FOR APPROVAL, THE BOARD REQUESTS THAT THIS AFFIDAVIT BE ATTACHED.

Despite the Secretary of State's recommendations in the two memoranda and sample printer's affidavit that proponents seek preapproval of a petition with regard to form, plaintiff elected not to do so. Instead, plaintiff circulated its petition without seeking advance assurance that the format of its petition complied with the Secretary of State's requirements.

C

On February 29, 2012, plaintiff filed over 24,000 sheets containing 226,339 signatures for a referendum on the act. The Bureau of Elections ultimately concluded that plaintiff had submitted over 203,000 valid signatures and reported to the board that the petition contained a sufficient number of valid signatures.

Despite the Secretary of State's reference to the board's requirement that a printer's affidavit be submitted at the time the petition is filed, plaintiff submitted a letter from a printer, which the board rejected. Thereafter, plaintiff submitted a printer's affidavit on March 14, 2012, which provided, in pertinent part:

> 3. THAT THE HEADING OF THE PETITION IS PRESENTED IN THE FOLLOWING FORM AND PRINTED IN CAPITAL LETTERS IN 14-POINT BOLD-FACE TYPE:
>
> **REFERENDUM OF LEGISLATION**
>
> **PROPOSED BY INITIATIVE PETITION**

On April 9, 2012, intervening defendant, Citizens for Fiscal Responsibility (CFR), a ballot question committee, timely challenged the petition on several grounds, including the type size of the heading. CFR asserted that the type size of the petition heading did not comply with the requirement of MCL 168.482(2) that it be printed in 14-point boldfaced type. CFR also asserted that plaintiff's summary of the petition was incomplete and misleading, the petition omitted the prior law that will be revived if the act is suspended, the petition omitted the effective date of the act, and the petition omitted reference to 2011 PA 9, a bill related to collective bargaining that was tie-barred to the act.

CFR submitted two affidavits from commercial printers with its challenge. Each of the commercial printers

asserted that not only did the petition heading submitted by plaintiff fail to conform to the 14-point-type-size standard, but, in fact, the text was smaller than required.

Plaintiff disputed CFR's assertion that the petition failed to comply with all the necessary formatting requirements. In support of its response, plaintiff presented a notarized affidavit from a printer attesting that the heading of the petition was in 14-point type. Plaintiff further argued that even if the heading type size was not 14-point, the petition heading substantially complied with the requirements. Plaintiff added that the remaining challenges by CFR were not within the jurisdiction of the board.

D

The board heard CFR's challenge on April 26, 2012. Director of Elections Christopher Thomas opined that the board's approval authority did not extend to the substance of the proposal, but rather was limited to whether the petition's format satisfied statutory requirements on a technical basis. Thomas acknowledged that CFR had presented two affidavits asserting that the heading was not in 14-point boldfaced type and that plaintiff had provided one affidavit asserting that the heading was compliant. Thomas advised the board that, in the past, it has reviewed such challenges for compliance with MCL 168.482 of the Michigan Election Law. Thomas also advised the board that previous caselaw had held that the board's duties were limited to determining whether the form of a petition substantially complied with the statutory requirements.

After statements by counsel for plaintiff and CFR, the board heard statements from two printers produced by plaintiff who each asserted that the petition's head-

ing meets the 14-point-size requirement. Bruce Hack, who holds a Bachelor of Science degree in printing management from the Rochester Institute of Technology and has decades of experience in the printing field, stated, in pertinent part:

> Basically when you're talking about 14-point type, you're talking about an area that's just less than a fifth of an inch, .194. And it becomes a canvas that a type designer gets to work with, and sometimes they use the whole canvas and sometimes they use part of the canvas. The particular type that was used for this petition, called Calibri, was designed by a Lucas DeGroot. He's probably 50 years old right now. And it became -- as I investigated more, it became the standard in Microsoft software in 2007.

Hack indicated that he used a computer program, rather than a ruler, to determine whether the text was in 14-point type:

> When I was asked to sign the affidavit, I took the file that we were given, that we had assembled for printing purposes, and I used a program -- because we're in the digital age -- and it's called PDF Suite. And I went in and I verified that it was 14-point and it was 12-point and it was 8-point. And just the other day I did a printout, a print screen, to show how I verified the type sizes. . . . [T]here is no way that you can just measure a capital letter and determine what the type size is. So every time you go to your computer and you say, hey, I'm going to use 14-point, you click on it, and depending on what type font you use will determine the strength [sic] of the letter that you're going to see; the overall height of the capital letters, the descenders, et cetera.

Printer Michael Migrin, a 1971 graduate of Ferris State College in the field of graphic reproduction technology, stated his opinion that the petition heading is in 14-point type. He indicated that actual type size can vary: "Now if you would look at every one of these

manufacturers, their sizes are a little different and their styles are a little different. It all depends who the manufacturer is." Rather than a ruler, Migrin used a printer's "cell" and a magnifying glass to measure the type size: "So I would invite anybody to take this cell and have a ten-power magnifying glass and to lay this cell onto this typeface here and compare if it is 14-point or not." He stated that every time something is printed, a slight change occurs from the original, so minute differences will occur. He demonstrated the differences between two point sizes, one a 12-point and the other a 14-point, and stated, "[I]f you look at it closely, you can see there's a slight difference in the shoulder on the type. And if you look at the character, the characters themselves are almost the same height, yet there's a shoulder which we refer to as the internal leading. This will give you a little better example of what I'm talking about as far as how the difference can vary."

Board member James Waters moved that the board approve the petition because it complied with the required number of signatures and with the other statutory requirements. His motion included a rejection of the challenge. Board Chairperson Julie Matuzak seconded his motion. Member Norman Shinkle, the board's vice chairperson, believed that a legitimate question existed regarding the size of the words and cited *Tea Party v Bd of State Canvassers*, unpublished order of the Court of Appeals, entered August 30, 2010 (Docket No. 299805).[5] Member Jeffrey Timmer said that he found no wiggle room in the statutory term "shall" so that the board was bound by that term. Waters and Matuzak voted in favor of certifying the

---

[5] Because *Tea Party* is an unpublished order, it is not binding precedent under MCR 7.215(C)(1).

petition; Shinkle and Timmer voted against certifying the petition. Because of the board's tie vote, the petition was not certified.[6]

E

Plaintiff thereafter filed the instant complaint for mandamus in this Court. In its brief in support of expedited consideration, plaintiff argues that "*[t]he type size of the petition heading was in 14 point font* . . . in accordance with MCL 168.482(1)," and that, therefore, it has a clear legal right to certification of the petition and defendants have a clear duty to certify the petition. Plaintiff argues in the alternative that even if the heading is not 14-point, under the relevant caselaw, only substantial compliance with the type-size requirement is necessary, and the petition heading substantially complies with the 14-point-type requirement. Plaintiff also maintains that the act of certifying the petition is ministerial and states that it has no other legal or equitable remedy. Plaintiff contends that CFR's additional challenges were not within the jurisdiction of the board, which had no authority to review the merits of the referendum, and that to the extent that the challenges should be reviewed, they are devoid of legal merit.

Defendants, the board and the Secretary of State, together answer that, although the board has a legal duty to declare the sufficiency or insufficiency of plaintiff's petition, the board was unable to pass a motion to do so given the deadlock. Defendants admit that the Constitution, the Michigan Election Law, and instruc-

---

[6] See MCL 168.22d(2), which provides: "Three members of the board of state canvassers constitute a quorum of the board. However, an action of the board of state canvassers shall only be effective upon concurrence of at least 1 member of each major political party appointed to the board."

tions from the Secretary of State do not require a particular font for petitions, but defendants also assert that these authorities do not indicate how type size should be measured in the event of a dispute. Defendants further contend that there is uncertainty in the law with respect to whether the board may review the type size of petitions under a substantial-compliance standard.

CFR intervened in the mandamus action[7] and argues that the board had a clear legal duty to deny the certification of the petition, on the basis that the petition heading is "nonconforming on its face" because it does not meet the 14-point-type-size requirement, a defect that could have been remedied before circulation of the petition if plaintiff had followed the standard protocol to obtain preapproval of the petition form. CFR also argues that plaintiff cannot rely on the substantial-compliance standard because the statute's mandatory language ("shall") requires the heading to be of 14-point type. Additionally, CFR contends that the summary of the proposal is incomplete and misleading. Finally, CFR states that plaintiff failed to completely republish the prior act, the effective date of the act, and the public act tie-barred to the act.

In their amici curiae brief, the Governor and the Attorney General assert that plaintiff's petition does not comply with the mandatory requirements of MCL 168.482 because the heading is not in 14-point type. They further maintain that modern computer software fonts cannot be equated to the long-established printer's standard adopted by the Legislature in 1954 and to which the statute continues to adhere. In the view of

---

[7] We granted CFR's motion to intervene in *Stand Up for Democracy v Secretary of State*, unpublished order of the Court of Appeals, entered May 11, 2012 (Docket No. 310047).

the Governor and the Attorney General, there is no evidence that the Legislature ever contemplated allowing the measurement standards established in MCL 168.482 to be flexibly applied because of the variability in text size inherent in diverse and evolving word-processing technology. Finally, the Governor and the Attorney General contend that the only way to verify type size is by using an E-scale printer's ruler and that plaintiff either should have used such a ruler to ensure that the type met the standard or, alternatively, that plaintiff should have obtained preapproval from the Secretary of State to establish compliance with the statute.

The American Civil Liberties Union Fund of Michigan (ACLU) also filed an amicus curiae brief and argues that plaintiff's petition is compliant with all statutory requirements. Alternatively, ACLU claims that even if the petition heading does not strictly comply with the statutorily mandated type size, the petition heading substantially complies with the statutory requirements, and certification of the referendum petition should occur without regard to the substance of the proposed referendum or any technical deficiencies that have little or no effect on signers of the petition.

II

A

This Court has jurisdiction over an original action for mandamus against a "state officer." MCR 7.203(C)(2), citing MCL 600.4401. For purposes of mandamus, the Secretary of State and the board are "state officers." *Citizens Protecting Michigan's Constitution v Secretary of State*, 280 Mich App 273, 282; 755 NW2d 157 (2008), aff'd in result only 482 Mich 960 (2008). Further, the

Michigan Election Law provides that a person aggrieved by a decision of the board may seek relief in the form of mandamus. MCL 168.479.[8]

B

This Court reviews de novo as questions of law whether a defendant has a clear legal duty to perform and whether a plaintiff has a clear legal right to the performance sought. See *In re MCI Telecom Complaint*, 460 Mich 396, 442-443; 596 NW2d 164 (1999). Issues regarding the application of a statute are questions of law. *Danse Corp v Madison Hts*, 466 Mich 175, 178; 644 NW2d 721 (2002). Courts review questions of law under a de novo standard of review. *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011). Additionally, this Court reviews de novo issues of statutory interpretation. *Eggleston v Bio-Med Applications of Detroit, Inc*, 468 Mich 29, 32; 658 NW2d 139 (2003); *Robert A Hansen Family Trust v FGH Indus, LLC*, 279 Mich App 468, 474-475; 760 NW2d 526 (2008).

When we interpret a statute, the primary goal must be to ascertain and give effect to the Legislature's intent, and the judiciary should presume that the Legislature intended a statute to have the meaning that it clearly expresses. *Mich Ed Ass'n v Secretary of State (On Rehearing)*, 489 Mich 194, 217-218; 801 NW2d 35 (2011). This Court determines legislative intent by examining the language used. *Casco Twp v Secretary of State*, 472 Mich 566, 571; 701 NW2d 102 (2005). Statutory provisions are to be read in the context of the

---

[8] MCL 168.479 provides: "Any person or persons, feeling themselves aggrieved by any determination made by said board, may have such determination reviewed by mandamus, certiorari, or other appropriate remedy in the supreme court."

entire act, giving every word its plain and ordinary meaning. *Driver v Naini*, 490 Mich 239, 247; 802 NW2d 311 (2011). Judicial construction is not permitted when the language is clear and unambiguous. *Id.* Courts apply unambiguous statutes as written. *Id.*

C

CFR makes various challenges to the adequacy of plaintiff's submitted referendum petition. Plaintiff argues that at least some of these challenges concern the merits of the referendum petition, which the board had no jurisdiction to consider, and that, accordingly, this Court should also decline to review the challenges. This Court reviews de novo matters concerning the threshold question of justiciability, including whether a matter is ripe for review. *Mich Chiropractic Council v Comm'r of the Office of Fin & Ins Servs*, 475 Mich 363, 369; 716 NW2d 561 (2006), overruled on other grounds in *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 371 n 18 (2010).

While challenges regarding the *substance* of petitions have historically been viewed as premature if brought before the initiative legislation comes into effect, see *Hamilton v Secretary of State*, 212 Mich 31; 179 NW 553 (1920), such is not the case for challenges regarding the legality or sufficiency of the *form of the petitions* themselves, *Leininger v Secretary of State*, 316 Mich 644; 26 NW2d 348 (1947). In other words, any substantive constitutional challenges regarding the validity of a ballot proposal are premature when made before the voters adopt the proposition in question. *Citizens Protecting Michigan's Constitution*, 280 Mich App at 288. But challenges regarding whether a petition meets the necessary constitutional or statutory requirements are properly brought before the board certifies any petition as valid. *Id.* at 288-289. Our Supreme Court has stated

that in a referendum context, as we have here, a controversy is ripe for review when its resolution "is not dependent upon the Board of Canvassers' counting or consideration of the petitions but rather involves a threshold determination whether the petitions" meet the prerequisites for acceptance. *Mich United Conservation Clubs v Secretary of State*, 463 Mich 1009 (2001). CFR's challenges probe this "threshold determination" because they contend that the petitions failed to comply with the form required by law. As a result, all of CFR's challenges are ripe for review.

### III

A plaintiff has the burden of establishing entitlement to the extraordinary remedy of a writ of mandamus. *Lansing Sch Ed Ass'n v Lansing Bd of Ed (On Remand)*, 293 Mich App 506, 520; 810 NW2d 95 (2011). The plaintiff must show that "(1) the plaintiff has a clear legal right to the performance of the duty sought to be compelled, (2) the defendant has a clear legal duty to perform, (3) the act is ministerial in nature, and (4) the plaintiff has no other adequate legal or equitable remedy." *White-Bey v Dep't of Corrections*, 239 Mich App 221, 223-224; 608 NW2d 833 (1999).

The parties do not dispute that if CFR's challenges to plaintiff's petition are rejected, plaintiff's entitlement to a writ of mandamus will have been established. If we determine that the petition qualifies for certification, plaintiff would have a clear legal right to have the board certify the petition, the board would have a clear legal duty to do so, the act would be ministerial because it would not require the exercise of judgment or discretion, and plaintiff would have no other legal or equitable remedy available. See *Citizens Protecting Michigan's Constitution*, 280 Mich App at 291-292. Hence, we

focus our attention solely on whether the petition meets the requirements for certification.

IV

A

1

CFR, the Attorney General, and the Governor argue that plaintiff does not have a clear legal right to the performance of any duty by the board on the basis that the referendum petition heading does not meet the statutory requirements and, therefore, the petition is defective. We agree that the petition heading does not comply with the format prescribed by the Secretary of State or the format required by MCL 168.482(2), but as discussed later in this opinion, under *Bloomfield*, this finding is not dispositive in the instant case.

As we noted earlier, MCL 168.544d provides, in part, that "[p]etitions circulated countywide shall be on a form prescribed by the secretary of state, which form shall be substantially as provided in" § 482. Here, both the Secretary of State's January 2011 memorandum and MCL 168.482(2) require that the heading be in all capital letters and that it *shall* be prepared in *14-point boldfaced type*. The term "shall" denotes mandatory conduct. *Manuel v Gill*, 481 Mich 637, 647; 753 NW2d 48 (2008). Importantly, neither the Secretary of State nor the statute use the term "font." "Font" is defined as "a complete assortment of type of one style and size." *Random House Webster's College Dictionary* (2d ed, 1997). "Font" incorporates all of the characteristics of a particular type, including the font family,[9] its size, and its style. For

_____

[9] Examples of font families include Times New Roman, Calibri, Arial, and so forth. See Microsoft typography, <http://www.microsoft.com/typography/fonts/family.aspx> (accessed June 7, 2012).

example, while they share the same font family, 12-point boldfaced Arial is one particular font, while 12-point italicized Arial is a different font. The statute specifies that the heading must be in capital letters and have (1) a particular size (14 points) and (2) a particular style (bold-faced). Because the heading was properly in bold and in capital letters, the only dispute is whether the heading was sized appropriately as 14-point type. The affidavits submitted by plaintiff and CFR conflict regarding the type size of the heading and, therefore, do not resolve the dispute.

The term "14-point" also is not defined by the Secretary of State's memoranda or by statute. When construing statutes, technical words that have acquired a peculiar and appropriate meaning must be construed according to that particular meaning. *Ford Motor Co v Woodhaven*, 475 Mich 425, 439; 716 NW2d 247 (2006), citing MCL 8.3a. Because there is no statutory definition for the term "point," it is proper to consult a dictionary for its common meaning. *Klooster v Charlevoix*, 488 Mich 289, 304; 795 NW2d 578 (2011). The *Random House Webster's College Dictionary* (2d ed, 1997) defines "point" in the printing context as "a unit of type measurement equal to . . . (1/72 inch)." Originally created by French typesetter Pierre Fournier in 1737, the measurement of a printer's "point" as 1/72 of an inch is a centuries-old standard. Saxena, *Headline Writing* (New Delhi, India: Sage Publications India Pvt Ltd., 2006), p 206. Therefore, type that is "14-point" is 14/72 of an inch, or as acknowledged by the various experts in this case, 0.194 inches.[10]

---

[10] Because 14-point is a unit of measurement easily determined by use of an E-scale ruler, neither this Court nor the board requires expert testimony to determine whether the correct measurement has been met.

It is clear from the record evidence that plaintiff's petition's heading is printed in Calibri, the current default family in Microsoft software. It is further undisputed that the font was categorized by the Microsoft software as "14-point." However, as conceded by the printers and by plaintiff in this case, the actual size of text varies depending on the font family chosen. In other words, "14-point" Calibri font measures in a different *type size* than "14-point" Arial font. Therefore, text in a so-called 14-point *font* may not necessarily meet the 14-point *type* standard of $^{14}/_{72}$ inches.[11] Because a heading of 14-point type is plainly and unambiguously prescribed by the Secretary of State and MCL 168.482(2), text that does not measure 14 points, or $^{14}/_{72}$ inches, is insufficient under the statute. Here, the Calibri font utilized in plaintiff's petition's heading is smaller than the prescribed 14-point-type measurement of $^{14}/_{72}$ inches. In fact, the heading on plaintiff's petition only measures 12 points on an E-scale ruler. Thus, plaintiff's petition contains a fatal formatting defect, and the petition is invalid under the Secretary of State's prescribed format and MCL 168.482.[12]

---

[11] Because "font" is defined as "a complete assortment of type of one style and size," "font" is *not* a unit of measurement.

[12] Plaintiff claimed in its motion to supplement the record that before the board's April 26, 2012, hearing, Director of Elections Thomas had been provided an expert opinion from Professor Chris Corneal, Associate Professor of Graphic Design at Michigan State University, that the heading size was accurate and that he improperly failed to submit that information to the board. Although we have denied plaintiff's motion to supplement the record, *Stand Up for Democracy v Secretary of State*, unpublished orders of the Court of Appeals, entered May 14, 2012, and June 8, 2012 (Docket No. 310047), we believe that it is important to note here that Director Thomas was only told what the record already reveals, that the heading was in 14-point Calibri *font*. Because the font utilized by plaintiff fails to comply with the required measurement of 14-point *type*, plaintiff's contention that Director Thomas withheld information from

Our inquiry does not end here, however. As we previously noted, plaintiff argues in the alternative that the form of the petition substantially complies with the statutory requirements and that under this Court's decision in *Bloomfield* certification is warranted. We agree that *Bloomfield* compels certification of the referendum petition in this case because the 12-point type of plaintiff's petition heading is in substantial compliance with the 14-point-type heading requirement prescribed by the Secretary of State in the January 2011 memorandum and dictated in MCL 168.482(2). However, because we conclude that *Bloomfield* was wrongly decided, we explain the rationale in *Bloomfield* and our disagreement with it.

The petition at issue in *Bloomfield* was for the initiation of an election to decide whether the intervening defendant, the city of Pontiac, could annex township property.[13] Under MCL 42.2a and MCL 42.34(5), after the circulation and signature of annexation petitions, the petitions are to be filed with the county clerk. MCL 42.2a provides that such petitions are subject to MCL 168.488. MCL 168.488 explains that these petitions are subject to the requirements of MCL 168.482(1), (4), (5), and (6). In addition, MCL 168.482(6) incorporates the requirements of MCL 168.544c(1) and (2).

---

the board that was relevant to and supportive of plaintiff's request for certification of its petition simply is inaccurate.

[13] The township initially challenged the petition before the special election, but the circuit court declined to enjoin that election on the ground that the township had the adequate legal remedy of a postelection quo warranto action. The election occurred, and Pontiac voters approved the annexation by a vote of 5,879 to 1,086; the township voters in the annexed area voted 14 in favor and 8 against. *Bloomfield*, 253 Mich App at 9.

Bloomfield Township asserted, *inter alia*, that the petition's warning language was not in the 12-point boldfaced type required by MCL 168.544c(1) and MCL 168.482(5). The circuit court denied relief to the township. *Bloomfield*, 253 Mich App at 4-9, 21. On appeal, the *Bloomfield* Court adopted the "substantial compliance" doctrine articulated in *Meridian Charter Twp v East Lansing*, 101 Mich App 805, 810; 300 NW2d 703 (1980), and affirmed the circuit court. Under the substantial-compliance doctrine, " '[a]s a general principle, all doubts as to technical deficiencies or failure to comply with the exact letter of procedural requirements are resolved in favor of permitting the people to vote and express their will on any proposal subject to election.' " *Bloomfield*, 253 Mich App at 21, quoting *Meridian*, 101 Mich App at 810. The substantial-compliance doctrine also examines whether "the petition language appears 'in sufficiently clear terms so that those signing the petition can be assumed to have understood to what it was they were appending their signatures.' " *Bloomfield*, 253 Mich App at 21, quoting *Meridian*, 101 Mich App at 810.

In affirming the lower court's conclusion that the petition was valid and that the annexation election should proceed, the *Bloomfield* Court acknowledged that "the relevant Michigan Election Law provisions clearly and unambiguously require that various components shall appear within a petition for annexation," and that the "annexation petition[] undisputedly contained several variations from the statutorily prescribed language." *Bloomfield*, 253 Mich App at 20, 22. Nevertheless, applying the substantial-compliance doctrine as articulated in *Meridian*, the Court found that the petition was properly certified as valid despite the failure of the petition to strictly comply with statutory petition requirements. *Id.* at 24-25. In the *Bloomfield*

Court's view, "the township has failed to direct our attention to any section of the Michigan Election Law or any other legislative act suggesting that the filing of a technically imperfect petition necessarily precludes an election regarding the matter therein addressed." *Id.* at 22. Thus, in contravention of the plain language of MCL 168.482(5) that the petition's warning "shall be printed in 12-point type," the *Bloomfield* Court applied the substantial-compliance doctrine "in this case involving [an] imperfect petition[], absent the Legislature's instruction that a petitioned-for election will be precluded unless the initiating petition[] exactly match[es] the Michigan Election Law requirements for form and content." *Id.* at 23.

In our judgment, *Bloomfield* was wrongly decided because it failed to apply the clear and unambiguous statutory language that the petition's warning language "*shall* be printed in 12-point type immediately above the place for signatures" as required by MCL 168.482(5). (Emphasis added.) The Legislature's use of the word "shall" denotes mandatory conduct, *Manuel*, 481 Mich at 647, and a court may not ignore the Legislature's instruction of mandatory conduct or make a different policy choice than what has already been made by the Legislature, *People v McIntire*, 461 Mich 147, 152-153; 599 NW2d 102 (1999) (" '[O]ur judicial role precludes imposing different policy choices than those selected by the Legislature . . . . When a legislature has unambiguously conveyed its intent in a statute, . . . the proper role of a court is simply to *apply* the terms of the statute . . . .' ") (citation omitted). The *Bloomfield* Court's conclusion that initiating petitions need not exactly match the Michigan Election Law requirements for form and content ignored the Legislature's use of the term "shall," a clear expression of its intent that the form of an initiating petition must be in

a specified type, and constituted an improper failure to recognize and defer to a legislative mandate.

In the instant case, the expression of legislative intent is even clearer. As we earlier mentioned, the Legislature amended MCL 168.482(2) in 1965 by striking the language permitting the petition heading to be in "type of the approximate size set forth" and replaced it with the mandatory language, "shall be . . . in 14-point boldfaced type." The inescapable conclusion to be derived from this amendment is that the Legislature no longer wished to permit heading type of an indefinite size, but instead intended to require the heading to be a uniform, standardized dimension—that of 14-point type, or $14/72$ inches.

In sum, under the plain language of MCL 168.544d, petitions being circulated countywide must strictly comply with the form requirements prescribed by the Secretary of State. Although the form requirements prescribed by the Secretary of State need only substantially comply with the sections enumerated in MCL 168.544d, in this instance, the Secretary of State's prescribed form requirements are the exact same form requirements as those mandated by MCL 168.482. Thus, but for MCR 7.215(J)(1), which requires us to follow the holding in *Bloomfield*, we would conclude that the petition heading is fatally defective, that plaintiff has no clear legal right to certification of the referendum for placement on the November 2012 ballot, and that the board is mandated to reject the petition as invalid.

B

CFR also argues that the summary in plaintiff's referendum petition is incomplete and misleading and

that, accordingly, the board was required to deny certification of the petition. We disagree.

The Secretary of State's January 2011 memorandum prescribed that the full text of the affected legislation must appear on a referendum petition. However, it further provided that

[i]f there is not sufficient space at the top of the signature side of the petition sheet to print the legislation which would be affected by the referendum, the introduction shall be followed by a brief synopsis of the legislation involved and reference shall be made to the reverse side of the sheet for the full text of the legislation. The full text of the legislation which would be affected by the referendum shall appear on the reverse side of the petition sheet after an introduction which identifies the legislation involved.

The brief synopsis provided by plaintiff on the petition states:

A PETITION for a referendum election to repeal Public Act 4 of 2011, which allows the governor to declare a local government or school district in receivership and appoint an emergency manger to take control with the following powers, among others: to assume the powers of local elected officials; to take control of revenue and spending; to terminate, modify and renegotiate contracts; to refuse to bargain with employee representatives; to take control of employee pension funds under certain circumstances; and with the governor's approval, to sell public assets or dissolve a city, township or county.

We conclude that the synopsis complies with the Secretary of State's requirements. The summary accurately states that the emergency manager has particular powers. Contrary to CFR's contention, the summary does not state that the emergency manager will exercise all those powers or suggest that the emergency manager will exercise the granted powers on a whim. CFR's argument that the language of a referendum *petition*

must meet similar requirements for the *ballot* language used for constitutional amendments is misplaced. There is nothing in the Michigan Constitution or in the statutory scheme that supports this argument. The constitution requires the *ballot* language for constitutional amendments to

> contain a statement of the purpose of the proposed amendment, expressed in not more than 100 words, exclusive of caption. Such statement of purpose and caption shall be prepared by the person authorized by law, and shall consist of a true and impartial statement of the purpose of the amendment in such language as shall create no prejudice for or against the proposed amendment. [Const 1963, art 12, § 2.]

Notably, the Constitution does not identify any such requirements for the *petition* language for a constitutional amendment. Instead, the Constitution provides that "[a]ny such *petition* shall be in the form, and shall be signed and circulated in such manner, as prescribed by law." *Id.* (emphasis added). Therefore, CFR's argument that the "true and impartial" reference in the Constitution applies to petition language is not persuasive.

CFR does not contend that the emergency manager's duties summarized in the petition are not within the emergency manager's powers. Instead, it argues that certain conditions must be present before the emergency manager may exercise those powers. Where the summary does not misstate the powers of the emergency manager under the act, a finding that the synopsis is adequate must follow. See *Coalition to Defend Affirmative Action & Integration v Bd of State Canvassers*, 262 Mich App 395, 406; 686 NW2d 287 (2004) (finding that petition language was not "propaganda" or misleading because the summaries did not introduce anything that was not found in the language of the proposed amendment).

C

CFR next argues that the petition is defective because the petition did not republish the prior emergency financial manager act, 1990 PA 72 (PA 72). We disagree.

CFR contends that because 2011 PA 4, the legislation at issue in the referendum, repealed 1990 PA 72, PA 72 would again govern in the event of the suspension of PA 4 pending the outcome of the referendum at the election, and that given this effect of the referendum, PA 72 was required to be republished along with PA 4. In asserting this view, CFR relies on the following provision in the format prescribed by the Secretary of State's January 2011 memorandum:

> If the petition offers a legislative proposal or a referendum of legislation which involves alterations to existing provisions of Michigan law, the alterations may be presented by showing any language that would be added to the provision or provisions in capital letters and any language that would be deleted from the provision or provisions struck out with a line.

CFR's reliance on this section is misplaced. First, 1990 PA 72 is not an "*existing* provision[] of Michigan law" because it was repealed once 2011 PA 4 became effective in March 2011. Second, the Secretary of State's prescribed format states that such alterations to legislation *may* be shown by strikeouts and capital letters. The use of the word "may" designates a permissive provision. *Jordan v Jarvis*, 200 Mich App 445, 451; 505 NW2d 279 (1993). Therefore, CFR's challenge based on the fact that 1990 PA 72 was not republished must be rejected.

D

CFR next argues that the petition is defective because it failed to republish the effective date of 2011 PA 4. CFR

claims that, although the petition correctly reflects that PA 4 was given immediate effect, "[p]laintiff's failure to identify the Effective Date and otherwise comply with the requirement to fully republish the act sought to be repealed is a fatal error, warranting denial of certification as to form." Because CFR failed to provide any authority to support its claim that an act's effective date is part of the act itself and therefore must also be published in a referendum petition, this issue is abandoned. *DeGeorge v Warheit*, 276 Mich App 587, 596; 741 NW2d 384 (2007). Moreover, we have failed to locate any authority that requires an act's effective date to be published in a referendum petition. As a result, CFR's argument fails.

E

Finally, CFR argues that the petition should not be certified because it also failed to publish the contents of Senate Bill 158 ("SB 158"). We disagree.

2011 PA 4 (Enrolled House Bill No. 4214) was tie-barred to 2011 PA 9 (Enrolled Senate Bill No. 158). As enacted, 2011 PA 4 stated, in part, that "[t]his act does not take effect unless Senate Bill No. 158 of the 96th Legislature is enacted into law." Likewise, SB 158 as enacted stated, in part, that "[t]his amendatory act does not take effect unless House Bill No. 4214 of the 96th Legislature is enacted into law." CFR claims that the tie-bar of these two bills requires 2011 PA 9 to also have been published on the referendum petition. CFR failed to cite any authority in support of this contention. Accordingly, we consider the issue abandoned. *DeGeorge*, 276 Mich App at 596. Even if we were to consider the argument, however, we would conclude that the argument lacks merit. The Secretary of State's June 2011 memorandum requires "[t]he full text of *the*

legislation which would be affected by the referendum" to appear in the petition. (Emphasis added.) Notably, publication of "the" legislation affected, not "any" or "all" legislation affected, is required. The plain reading of the Secretary of State's requirement in the context of a referendum petition establishes that "the" refers only to the subject of the referendum, in this case 2011 PA 4.

*Reynolds v Bureau of State Lottery*, 240 Mich App 84; 610 NW2d 597 (2000), supports this interpretation of the Secretary of State's memorandum. In *Reynolds*, this Court explained, "According to the Michigan Constitution, the people reserve the right to refer 'laws enacted by the legislature . . . .' Const 1963, art 2, § 9. The 'law' referred to by our constitution can only be *a definite, specific act . . . .*" *Reynolds*, 240 Mich App at 97 (emphasis added). Moreover, "when a law enacted by the legislature is referred to the people, the reference is of a particular definite act and not, by implication, the general principle or subject matter at issue in the act." *Id.* (quotation marks, brackets, and citation omitted). Moreover, " ' "[n]owhere in the Constitution can be found even a suggestion that a referendum petition has any effect except the nullification of *the particular measure referred* until its approval by the voters.' " *Id.* at 94, quoting *Mich Farm Bureau v Secretary of State*, 379 Mich 387, 396; 151 NW2d 797 (1967), quoting *McBride v Kerby*, 32 Ariz 515, 523; 260 P 453 (1927) (emphasis added). Thus, given the prior precedent of this Court and the Supreme Court, we hold that the Secretary of State's requirements do not require any other act to be published in the petitions other than the act that is the direct subject of the referendum.

In addition, the tie-bar language of 2011 PA 9 required only that 2011 PA 4 must have been enacted into law in order for 2011 PA 9 to "take effect." Unquestion-

ably, this condition was satisfied on March 16, 2011, when both 2011 PA 4 and 2011 PA 9 became effective. The tie-bar language did not state, however, that 2011 PA 9 would "remain" in effect only as long as 2011 PA 4 is effective. In other words, the tie-bar language addressed when the act could *come into existence,* but the tie-bar language had no bearing or influence after that incident or condition occurred, and once both acts became effective, the two acts were no longer contingent upon each other. See OAG, 1979-1980, No 5478, p 129 (April 4, 1979) ("Tie-barred statutes are statutes which do not become operative until the happening of a contingency, the passage of another statute."). If the Legislature had intended a more permanent linkage between the two acts, it could have used more expansive language to make clear that 2011 PA 9 would remain in effect only as long as 2011 PA 4 remained in effect.

We recognize that two subsections of 2011 PA 9 (subsections 8 and 9) would appear to be made inoperable if 2011 PA 4 is repealed because these sections both refer to 2011 PA 4 by its name, "the Local Government and School District Fiscal Accountability Act":

> (8) Collective bargaining agreements under this act may be rejected, modified, or terminated pursuant to *the local government and school district fiscal accountability act.* This act does not confer a right to bargain that would infringe on the exercise of powers under *the local government and school district fiscal accountability act.*
>
> (9) A unit of local government that enters into a consent agreement under *the local government and school district fiscal accountability act* is not subject to subsection (1) for the term of the consent agreement, as provided in *the local government and school district fiscal accountability act.* [Emphasis added.]

Regardless, the fact that subsections 8 and 9 of 2011 PA 9 would become inoperable with the repeal of 2011 PA 4

does not constitute the repeal of these subsections. See *Reynolds*, 240 Mich App at 94 (the only effect of a referendum is to nullify "the particular measure referred") (quotation marks and citations omitted).

Therefore, we reject CFR's final challenge to the validity of plaintiff's referendum petition.

V

In summary, under *Bloomfield*, plaintiff's petition substantially complies with the statutory requirements to the extent that plaintiff has a clear legal right to certification of the petition. Defendants have a clear duty to certify the petition for the ballot because the petition has the requisite number of signatures and meets all other statutory requirements. Under all the circumstances presented here, the act of placing the petition on the ballot is ministerial. Plaintiff does not have an alternate legal remedy. The elements of mandamus thus have been met and we direct the board to certify plaintiff's petition for the ballot. However, as we have indicated, but for the fact that we are required to follow *Bloomfield* under MCR 7.215(J)(1), we would rule that plaintiff's petition is invalid because the petition heading is noncompliant with the 14-point type mandated by the Secretary of State and MCL 168.482(2). Furthermore, because of the invalid petition heading, we would find that plaintiff has no clear legal right to certification of the referendum for placement on the November 2012 ballot, and therefore, we would direct the board to not certify plaintiff's petition for the ballot.

Because *Bloomfield* is determinative of the outcome of this case, we follow it as we must under MCR 7.215(J)(1), and we call for the convening of a special panel of this Court pursuant to MCR 7.215(J)(3). This

judgment is issued pursuant to MCR 7.215(F)(1) and execution is stayed pending the poll of the judges of this Court pursuant to MCR 7.215(J)(3)(a).

WILDER, P.J., and K. F. KELLY and RIORDAN, JJ., concurred.